## ZIANG SUN WAN v. UNITED STATES.

(Court of Appeals of District of Columbia.   Submitted April 3, 1923.   Decided May 7, 1923.)

### No. 3807.

1. **Criminal law ☞516—Accused's statement held not a confession required to be voluntarily made.**

    A statement by accused, when questioned about a trip to the bank to cash a check the securing of which was claimed to be the motive for the homicide, "Who is the man who went to the bank? who is the murderer?" was not a confession, nor even an admission of defendant's connection with the transaction, but a casual observation, which an innocent person might have made, and it became significant only in connection with defendant's confession subsequently made, admitting that he took the check to the bank, so that it was not error to overrule a motion to strike out the statement for failure to show it was voluntarily made.

2. **Criminal law ☞516—Admission of incriminating fact is not a confession.**

    Defendant's admission that he wrote a check the securing of which was claimed by the government to be the motive for the murder was not a confession, which does not include a mere admission or statement of an independent fact from which guilt may be inferred, or even incriminating acts.

3. **Criminal law ☞516, 517(1)—"Confession" is declaration acknowledging participation in crime, and is admissible if voluntary and is not voluntary if induced by promises or threats.**

    A "confession" is a declaration made by a person charged with crime, acknowledging his participation in its commission, and is admissible if voluntarily made, but not if made involuntarily; that is, if influenced by promises or threats.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Confession.]

4. **Criminal law ☞519(1)—Hope of leniency, not induced by promises or threats, does not make confession involuntary.**

    The fact that accused hoped to obtain leniency by his confession does not make the confession involuntary, when the hope was not induced either by promises or threats made by the officers.

5. **Criminal law ☞736(2)—Voluntary character of confession held question for jury.**

    Where the officers testified that accused was given opportunity to think over the matter before he made his confession, and that several days elapsed after he was first questioned before he finally dictated a confession, which he signed the following day, and defendant made no claim that he was induced by promises or threats to make the confession, but only that he was worn out by a repeated questioning and confessed, so that he would be let alone, and the confession as made was corroborated by all of the other circumstances in evidence, the question whether it was voluntary was properly submitted to the jury.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Homicide ⊜⟹166(4)—Evidence of defendant's financial condition held admissible to show motive.**

In a prosecution for murder, where defendant's confession showed that the forgery of check in connection with which the murder was committed was the motive, evidence of defendant's financial condition at and prior to the time of the homicide was competent.

**7. Criminal law ⊜⟹1092(1)—Chief Justice of District Supreme Court can decide bill of exceptions after trial judge's death.**

Where the judge who tried a homicide case died before the bill of exceptions was signed, the Chief Justice of the District Supreme Court was authorized by Rev. St. § 953, as amended by Act Cong. June 5, 1900 (Comp. St. § 1590), which applies to the District of Columbia, to settle and sign the bill, and it was unnecessary to restore the case to the docket for a new trial.

**8. Criminal law ⊜⟹898—Objection to examination of accused by court is waived by insistence it be left to the jury.**

Where the court examined accused to determine whether his confession was voluntarily made, and at the close of the examination withdrew the last question and answer, and instructed the jury to disregard them the insistence of defendant's counsel that all the questions and answers of the court should go to the jury intact, without exception, waived any right to complain of the court's examination.

**9. Criminal law ⊜⟹1056(1)—Exceptions to instructions, raised for first time on appeal, are generally not considered.**

The general rule is that where an exception to an instruction given in a criminal case is not taken at the time, the court will refuse to consider objection raised for the first time on appeal.

Appeal from the Supreme Court of the District of Columbia.

Ziang Sun Wan was convicted of murder in the first degree, and he appeals. Affirmed.

James A. O'Shea, Charles Fahy, and John I. Sacks, all of Washington, D. C., for appellant.

Peyton Gordon and J. H. Bilbrey, both of Washington, D. C., for the United States.

Before SMYTH, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. Appellant, Ziang Sun Wan, appeals from a verdict and judgment in which he was found guilty of murder in the first degree and adjudged to pay the death penalty.

It appears that about January 22, 1919, defendant Wan came from New York to Washington and stopped at the Chinese Educational Mission, which at that time was conducted by Dr. Thomas T. Wong, director, C. H. Hsie, secretary-treasurer, and Ben Sen Wu, secretary and clerk. Defendant remained at the Mission, located at 2023 Kalorama Road, this city, until January 27th, when he procured a room at the Harris Hotel. On the same day he telegraphed his brother Van in New York City to come to Washington. On the next day he sent a second telegram to his brother urging him to come immediately. On the following day the brother arrived and was seen at the Harris Hotel between 9 and 10 o'clock a. m. On the evening of January 29th Kang Li, a student under the supervision of the Mission, called at the Mission, and defendant came to the door. He inquired whether

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Mr. Wu or Dr. Wong were at home. Defendant replied that they had gone out and that he was going out later. About midnight Wan and his brother Van were seen together at the Harris Hotel.

The testimony on behalf of the government shows that on the following morning, January 30th, defendant and his brother engaged a taxicab near the Union Station and drove to the Riggs National Bank, where Wan remained in the cab, while Van entered the bank and presented for payment a check in the sum of $5,000, purporting to be signed by C. H. Hsie and Dr. Wong, and drawn upon the account of the Chinese Educational Mission. The bank, after some investigation and at the suggestion of the brother, telephoned the Mission, but received no reply. The bank then refused to cash the check without further identification, and defendant and his brother returned to the Union Station, where the brother paid for the use of the taxicab. About noon of the same day defendant checked out at the Harris Hotel, and about 5 o'clock in the evening the brother was seen near his lodging place in New York, and defendant was seen at a Chinese café in that city at 7:45 p. m. of the same day.

It further appears that Dr. Wong and Hsie were last seen alive between 10 and 11 o'clock on the night of January 29th. On January 30th a letter carrier made three attempts to deliver mail at the Mission but no one responded. On the evening of January 31st, the Chinese legation caused the Mission to be entered by Kang Li, who found the body of Dr. Wong in the reception hall with two gunshot wounds in his chest, one of which had entered the heart, and the bodies of Wu and Hsie were found in the basement, one having gunshot wounds in the chest and the other a gunshot wound in the head. A .32-caliber revolver was found on a chair in the basement.

On February 1st, defendant was arrested in New York, and, together with his brother Van, brought to this city. Defendant gave conflicting accounts as to his whereabouts after leaving the Mission on January 27th. He first said that he had left Washington on that date, but when confronted by Kang Li, who saw him at the Mission on the evening of January 29th, he then said that he left Washington on the 29th. When questioned, he insisted that he had taken dinner with Hsie and Wong on the evening of January 29th, and that Wong had gone with him to the Union Station, where he took a train leaving for New York. When his attention was called to the fact that Wong had dined on the 29th with a Mr. Jeffers, defendant admitted that Wong did not dine with him, but insisted that he did go with him to the station.

Defendant was held in custody at a hotel until February 8th, when, at his request, he was taken by the officers to the Mission. He was there confronted with photostat copies of his own handwriting, and also a photostat copy of a check stub, from the check book of the Chinese Educational Mission, upon which was written "T. T. Wong, $5,000." When confronted with the copies of his own writing and the check stub, he finally admitted that he had written the check.

From the Mission house the defendant was taken to the police station and there charged with murder. On the following day the defendant

told the officers that he saw the three Chinamen killed and that a Chinaman named Chen had killed them. When urged for an account in detail, he answered that he was tired, but would tell them about it the next day. The following day he again requested to be taken to the Mission, and when they arrived there he began to explain in detail how Chen had killed the three men, but, on being told by an officer that he knew that Chen had not committed the murder, defendant then said in effect that he and Wu were engaged in forging the $5,000 check, when Wong and Hsie came into the house; that Wu, having procured the revolver, killed Wong and Hsie, and that he (defendant) a short time after shot Wu. On the following day, February 11th, defendant made a detailed statement to an officer, which was taken down stenographically, transcribed, and on February 12th signed by the defendant.

It will be observed that the greatest deliberation and consideration was displayed by the officers toward defendant when he first suggested at the police station, on Sunday evening, following the first visit to the Mission house, that he witnessed the murder. When pressed for details, he "said he was tired; wanted to go to sleep; would talk no more to-night." They left him to consider the matter until the next morning, when they again visited him in the police station, and at his request he was taken to the Mission, where he began to detail the killing, charging Chen with the killing of Wu. At this point one of the officers said:

"Wan, you know how this happened. You put a man by the name of Chen in it. I know there was no Chen. You are the man that you are placing here in the story as Chen."

After hesitating a minute, defendant said:

"Yes; I will tell you the whole truth. Chen was not in it."

After detailing the killing, as already outlined, he was taken back to the police station, and not until the next day was he questioned for the purpose of procuring a stenographic report, and not until the following day was he presented with the extended report for his signature. Through all this period he had an opportunity to deliberate upon the effect the making of the confession would have upon his case. It also appears, from the signed confession, that before making the statement he was cautioned by the officer as follows:

"We would like for you to make a statement. Your statement must be voluntary, and if you make it I want to tell you it will be used against you in court. You do not have to make a statement unless you want to. I just want to inform you of your rights in the matter." .

The defense offered as a witness defendant's brother Van, who testified that on January 30th he and defendant went to the Union Station, where they met two Chinamen, T. P. Wong and Moy, whom Van had met the day before; that Wong told Van that he had a check which he wanted cashed; that he did not speak English very well, and that he wanted Van to help him cash the check. He testified that it was Wong, and not Van, who went with him to the Riggs Bank and

remained in the taxicab while he was in the bank attempting to have the check cashed, which he alleges Wong had given him.

The defendant took the stand on his own behalf and denied all connection with the murder, corroborated his brother to the effect that it was Wong, and not he, who went with Van to the bank; denied that he admitted that the signature on the check stub was his, and accounted for the signed confession on the theory that the officers had importuned him to confess, threatened him, and used abusive language toward him. He testified in substance that when he signed the confession he knew what he was doing, but that he signed it because he was sick and wished to be left alone.

The testimony of defendant was in the nature of a general denial of the evidence given by the officers and witnesses on behalf of the government, especially as to defendant's alleged treatment by the officers, which he claims induced him to confess. This, however, presented a well-defined issue of fact as to whether or not the confession was voluntarily made, and, like all other issues of fact, was one for the consideration of the jury. The issue of the voluntary or involuntary character of the confession was submitted to the jury in a very full and complete charge, in part as follows:

"The test of the case, and the inquiry that you will have to make in answer, is: Did the questioning, did the physical condition, did the importunate questioning, if you choose to call it so, render the confession made by this defendant not his own; but did it substitute for his will the will of another, and thus was it or not his voluntary act? It is impossible to define the limit to which an officer may or should go in detecting or attempting to detect crime. On the one side, he has his duty to the public, to us, always. On the other hand, he must not infringe upon the rights of the citizen, no matter who he may be. He must leave the confession in such a way that you can satisfy yourselves that it is the ultimate expression of the will of the defendant, the voluntary statement of what he knows about his connection with the case."

[1] Coming to the assignments of error, 127 in number, they may be classified under a very few heads. An officer testified that while defendant was at the hotel he was being questioned by the witness respecting the taking of the check to the bank. The officer asked him who went to the bank, suggesting, "That has nothing to do with the murder; tell me who went to the bank;" and the defendant said, "Mr. Grant, after what you said, who is the man who went to the bank? who is the murderer?" Counsel for defendant moved to strike out this statement, for the reason that it was not shown to have been voluntarily made, but was made in reply to an inducement by the officer. Counsel seems to have regarded the statement as a confession. It was not even an admission of defendant's connection with the transaction. It was a mere casual observation, which an innocent bystander might logically have made. At the stage of the investigation when the statement was made, it had no more significance, coming from guilty lips, than if it had been innocently uttered. It only became a significant circumstance, when in his confession defendant subsequently admitted that he and his brother took the check to the bank, and his further statement in the confession that the forgery of the check was directly associated with the commission of the murder.

[2] The admissibility of the written confession and the testimony relating to the admission of the handwriting by defendant are challenged. As to the alleged admission respecting the handwriting, it does not come within the category of a confession, since it is admitted by defendant in his signed confession, testified to by the officers, and denied by defendant on the witness stand. Hence it is reduced to a mere fact or piece of competent evidence, upon which there was a conflict in the testimony, and which was properly submitted to the jury for its consideration.

The term "confession" has no application to a mere admission or statement of an independent fact from which guilt may be inferred, or even to incriminating acts. State v. Campbell, 73 Kan. 688, 85 Pac. 784, 9 L. R. A. (N. S.) 533, 9 Ann. Cas. 1203; Rusher v. State, 94 Ga. 363, 21 S. E. 593, 47 Am. St. Rep. 175. In other words, an admission, not of guilt, but tending merely, in connection with other facts, to establish guilt, does not amount to a confession. McGehee v. State, 171 Ala. 19, 21, 55 South. 159; People v. Jan John, 144 Cal. 284, 77 Pac. 950; State v. Willis, 71 Conn. 293, 41 Atl. 820; 2 Wigmore on Evidence, § 1050.

[3] A confession is a declaration made by a person charged with crime acknowledging his participation in its commission. Confessions may be either voluntary or involuntary. If voluntarily made, they are admissible as competent evidence against the accused; otherwise, the question arises as to whether the confession was extorted by fear or induced by hope of benefit. In other words, whether the person to whom the confession is made induced it by promises exciting hopes, or by actual threats.

The rule as to the admissibility of confessions is concisely stated in 3 Russell on Crimes (6th Ed.) 478, and approved in Bram v. United States, 168 U. S. 532, 542, 18 Sup. Ct. 183, 187 (42 L. Ed. 568), as follows:

"But a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * * A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."

In all cases, however, the confession must have been induced by the excitation of hope or fear arising from an actual threat or promise made by a person in authority. Hardy v. United States, 3 App. D. C. 35, 46. Or as concisely summarized in the Bram Case:

"It must necessarily have been the result of either hope or fear, or both, operating on the mind."

In the last analysis, there is little distinction between a promise and a threat made by one in authority. The promise implies leniency toward the defendant, while the threat implies that the inducement for making the confession is that the law will deal more leniently with the accused. It follows, therefore, that in both instances the hope of leniency is the inducing cause.

289 F.—58

[4] It is not, however, contended by defendant that he was induced to make the confession through any promise of hope held out by the officers. While he undoubtedly thought that leniency and mercy might result from confession, his excuse for making it is that they importuned him with questions and used abusive language toward him, neither of which are within the category of promise or threat. The crucial test to be applied in determining whether or not a confession is voluntarily or involuntarily made depends upon its truth or falsity. As was said by the court in Commonwealth v. Dillon, 4 Dall. 116, 117 (1 L. Ed. 765):

"If such declarations are voluntarily made, all the world will agree that they furnish the strongest evidence, of imputed guilt. The hope of mercy actuates almost every criminal who confesses his crime; and merely that he cherishes the hope is no reason, in morality, nor in law, to disbelieve him. The true point for consideration, therefore, is whether the prisoner has falsely declared himself guilty of a capital offense? If there is ground even to suspect that he has done so, God forbid that his life should be the sacrifice!"

[5] Applying this rule, the present confession accords with every reasonable theory of guilt. All the circumstances in the case corroborate it. Therefore its admissibility, as competent evidence for the consideration of the jury, is supported by every principle of law. Certainly the evidence tending to show that it was involuntarily made was not so conclusive as to justify the court in excluding the confession from the jury. It was submitted properly, as an issue in the case, and the jury found that it was voluntarily made. This conclusion is amply supported by the evidence in the case.

[6] On the question of motive, evidence of the financial condition of defendant at and prior to the time of the homicide was admitted over the objection and exception of defendant. Those transactions had direct relation to the Mission. Two checks he had received from Wu—one on the 27th, the day he left the Mission. He was presumably indebted to Wu at the time of the homicide. These facts, taken in connection with his confession that the forgery was committed to get some of the Mission's money, and the further fact of his attempt to cash the forged check, all tend to establish the motive for the commission of the crime.

"Wide latitude is allowed the prosecution in criminal trials in ascertaining the motive that actuates the commission of crime." Lomax v. United States, 37 App. D. C. 414, 417.

[7] The judge who tried the case in the court below died before the bill of exceptions was signed. The bill was settled and signed by the Chief Justice of the Supreme Court of the District. It is insisted that no such power was reposed in the Chief Justice, and that the case should have been restored to the docket for a new trial. This exception is fully disposed of in Roney v. United States, 43 App. D. C. 533, where it was held that section 953, R. S., as amended by Act of Congress of June 5, 1900 (31 Stat. 270 [Comp. St. § 1590]), providing that, in the case of the death of the presiding judge, any judge of the same court may settle and sign a bill of exceptions, applies to the

District of Columbia. The law on this point, therefore, may be regarded as settled by the Roney Case.

[8] When defendant was on the witness stand, the court examined him at length, evidently for the purpose of ascertaining whether or not the confession had been voluntarily made. This examination by the court is assigned as error. It appears, however, that, when the court concluded its examination, the judge, of his own volition, directed the reporter to strike out the last question and answer, instructing "the jury to disregard it," whereupon counsel for defendant objected to the action of the court, insisting that "it should stay in the record." To this the court replied, "All right, it goes." The district attorney inquired if "he wanted it to go to the jury." Counsel for defendant replied:

"I certainly do. I want all the questions and answers of the court to go to the jury intact, the way they were asked and answered.

"The Court: Without exception?

"Mr. O'Shea: Yes.

"The Court: That is satisfactory."

It is difficult to understand the position now assumed by counsel for defendant, after insisting that the testimony should go to the jury without objection or exception. This amounts to a complete waiver of any right to claim error on appeal. Counsel will not be permitted to thus inveigle the court into complying with a specific request, for the purpose of using it as a basis for error on appeal.

[9] A single exception was reserved by counsel for defendant to the instructions as given by the court, and this was directed to an unimportant and unobjectionable point. Its total lack of merit seems to have been appreciated by counsel, since it is not discussed in his brief. However, considerable space has been devoted in the brief of counsel in pointing out what is regarded as objectionable features in the instructions. The general rule is that, where exception is not taken at the proper time, the court will refuse to consider objections raised for the first time on appeal. Owing, however, to the gravity of the judgment, we have carefully reviewed the charge of the court, and find it to be, not only without error, but so expressed that no safeguard which the law throws around a person accused of crime, for the protection of his rights, was in this instance omitted.

The other errors assigned are not of sufficient importance to merit consideration.

The judgment is affirmed.

Petition for writ of error to United States Supreme Court denied May 24, 1923.