## Ex parte TOZIER. *

(District Court, D. Maine. April 5, 1924.)

1. Aliens ⬤�longdash46—"Admits," as used in statute providing for deportation of alien admitting crime, defined.

"Admits," as used in Immigration Act, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), providing for deportation of alien "who admits the commission, prior to entry, of a felony," etc., means an unequivocal acknowledgment of guilt, leaving no ground for doubt, and, if inclusive of statement made outside of deportation proceedings, it must be acknowledged by alien in those proceedings, and amount to a confession.

[Ed. Note.—For other definitions, see Words and Phrases, Admit.]

2. Aliens ⬤�longdash46—Admission of facts deemed to establish alien's guilt of crime not an admission of crime, warranting deportation.

Admissions of fact by alien deemed sufficient by immigration officials to establish his guilt of crime were not admissions of commission of a crime, within Immigration Act, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), providing for deportation; it being not a proper function of immigration tribunals to balance facts and decide when they establish an alien's guilt.

3. Aliens ⬤�longdash46—Alien's testimony in extraneous case held not an admission of crime, warranting deportation.

Alien's testimony in prosecution of another held not to warrant finding that he therein admitted commission of crime, and justify his deportation, under Immigration Act, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj).

Habeas Corpus. Proceeding by Frederic M. Tozier against the Commissioner of Immigration. Petitioner discharged.

John F. A. Merrill, of Portland, Me., for appellant.

Joseph E. F. Connolly, of Portland, Me., for appellee.

MORTON, District Judge. Habeas corpus to the Commissioner of Immigration to secure the discharge of the petitioner, who is held for deportation. The facts, which for the most part are not seriously in dispute, are as follows:

The petitioner came to this country from Canada in 1912, and has for many years practiced medicine in and near Portland. In January, 1923, and for some time previous, he conducted a sanitarium for the treatment of drug addicts and persons suffering from alcoholism. He owns real estate worth $25,000 or $30,000, subject to an incumbrance, according to the testimony, of only $1,000. On or about January 24, 1923, he went to Montreal, Canada, to see a friend. He returned to this country two days later, on January 26, 1923. At that time he was not an American citizen, nor had he declared his intention of becoming one. He passed whatever inspection and examination was required at the frontier and was duly admitted. As he was a resident alien, long domiciled in this country, the examination was hardly more than a formality. There is no question but what at that time, and at his original entrance in 1912, he complied with all the requirements of law.

In 1922 several indictments had been returned into the United States District Court of Maine against various persons, among them Ruth and Fry, who were United States narcotic inspectors, for a conspiracy to extort money from physicians and others by threats of prosecution for violations of the Narcotic Drugs Act (Comp. St. §§ 6287g–6287q). Two indictments were returned against the petitioner in this connection. In one indictment against Ruth and Fry, the petitioner was named as one of the conspirators, but not as one of the defendants. When this indictment was tried before Judge Peters and a jury in December, 1922, the petitioner was called and testified as a government witness. It was the understanding of the United States attorney and of the District Judge, as appears by his letter in the file, that Tozier would not be prosecuted if he so testified, and assurances to that effect were given him by the United States attorney. Ruth was acquitted, and Fry was convicted and is now serving prison sentence.

In February, 1923, deportation proceedings were instituted against Tozier, based upon allegations that at the time of his return to this country from Montreal on January 26, 1923, he was likely to become a public charge, and had been convicted of or had admitted the commission of the crimes of extortion, bribery, or conspiracy. There were several hearings under this warrant. Eventually the proceedings were dropped and the warrant canceled.

In July, 1923, another warrant proceeding was instituted against him upon the

*Decree affirmed 3 F.(2d) ——.

same grounds, viz. that "he was a person likely to become a public charge at the time of his entry, and that he has been convicted of or admits the commission of a felony or other crime or misdemeanor involving moral turpitude prior to his entry, to wit, bribery, conspiracy to defraud, or extortion" (warrant of July 6, 1923). Several hearings were held under this warrant, at which the petitioner was represented by counsel. Inspector Howes, by whom the case was heard in the first instance, reported: "He [the alien] does not admit in so many words the commission of a felony, or other crime of misdemeanor involving moral turpitude; * * * but prior to his departure from the United States he admitted that he was guilty of extortion, as evidenced by his testimony given as a witness" in the case against Fry and Ruth. The inspector further found that, as there were outstanding indictments against Tozier on which he might be convicted, he was therefore a person likely to become a public charge. On appeal the Board of Review, on whose findings the Second Assistant Secretary acted in ordering deportation, found in favor of the alien on the allegation that he was likely to become a public charge. There was no evidence that he had ever been convicted of any crime, and this ground was not relied on by the government. The board found that the transcript of Tozier's testimony in U. S. v. Fry sustained the charge that he had admitted the commission of a crime sufficient to warrant deportation.

There are two questions: (1) Whether the finding is sufficient on its face to justify the action taken; (2) whether there was any evidence in support of it.

[1] The act excludes, inter alia, any alien "who was convicted, or who admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude." Section 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj). Of course, bribery, extortion, and conspiracy of the kind here in question are such crimes. So the real question is: What is meant by the expression "admits the commission of" a crime. The dictionary synonyms for "admit" are "acknowledge"; "confess." See Ziang Sun Wan v. U. S., 53 App. D. C. 250, 289 F. 908, 1913; Commonwealth v. Dascalakis, 243 Mass. 519, 137 N. E. 879. In law the word "admission" is used in a broader sense as including any statement made by a party to the proceedings which has probative bearing upon the issue.

The extreme government position as to the meaning of the statute is that it would be competent for the immigration tribunals to receive evidence that the alien had admitted to another person at some previous time the commission of a crime, and, if they believed the evidence, to debar or deport on this ground, although the alien denied ever having made the statement or committed the crime, and that it would not be necessary for the admission to take the form of an express acknowledgment of guilt, but that any statement of facts from which guilt could be inferred would constitute an admission. It is obvious that this is opening a very wide door. No decision whatever upon the point has come to my attention, nor any discussion of the statute in Congress which would be helpful in throwing light on the meaning of the words used.

Conviction for a major crime is in all civilized countries a definite matter, and, as far as I am informed, a matter of record. There can be little room for argument about it, except upon the point of identity between the person convicted and the alien. Following this surely ascertainable ground comes the word "admits." It speaks in the present tense, and on first reading one would naturally suppose it to refer to the proceedings before the immigration tribunal, and to make a confession in those proceedings the equivalent of a proved conviction. The statute contemplates, I think, indisputable proof or unequivocal acknowledgment of guilt—an acknowledgment which shall leave no fair ground for doubt or debate. There is a difference between admitting facts from which an inference of guilt may be drawn and admitting the commission of a crime. If the statement relied upon as an admission may be made outside of the deportation proceedings—a point which it is unnecessary to decide—it must in any event be acknowledged by the alien in those proceedings, and it must amount to a confession of guilt, or must state facts of such conclusive character as to be tantamount to an out-and-out confession.

[2] The Board of Review found that, "although in that record it is not disclosed that the alien in so many words admitted the commission of any of the offenses charged in the department's warrant of arrest, he nevertheless made admissions of fact sufficient not only to convict his associates but also to *establish* [italics mine] as a matter of fact and law his own guilt." In effect it ruled that "admissions of fact sufficient * * * to establish * * * guilt" were

admission of the commission of a crime within the statute. In my opinion this was fundamental error of law, which invalidates the proceedings. It is not the proper function of the immigration tribunals under this clause in the statute to balance facts and to decide when the facts establish guilt. The conclusion so reached is not an admission of guilt by the alien.

The case was fully heard before me, not only as to the validity of the order of deportation, but also as to the alien's right to remain in this country. As has been said, no ground of deportation is now insisted upon, except that in his testimony in the Fry Case he admitted the commission of a crime which would warrant deportation. His testimony covered more than 100 pages of transcript and is too long to summarize. I have carefully examined it. Throughout it the witness maintained that he was the unwitting tool of Fry, and was not aware that the sums which Fry was collecting from the victims were not being properly turned over to the government. The Harrison Act provides that the department itself may assess penalties for certain violations without proceedings in court or any publicity—a provision easily capable of misuse in unscrupulous hands. In the course of a long cross-examination Tozier was asked: "Q. Outside of Kincaid, the only men you tried to hold up were your friends? A. Yes." The next question was: "And you tried to hold up Kincaid because he was an enemy? A. I don't know as I did that. I was sort of sore on Kincaid, and I suppose talked more than I should."

[3] It was suggested by the government at the argument on this writ that the first question and answer above quoted warranted the finding. They are not referred to by the immigration tribunals and do not appear to have been so relied on by them. Both Inspector Howes and the Board of Review dealt with the testimony as a whole, which is the way it ought to be considered. The witness had not admitted holding up anybody; he had steadily insisted that he had not done so. There was no warrant in his previous testimony for the cross-examiner's assumption. The immigration tribunals were dealing with written evidence; no inferences based upon the appearance of the witness are involved. Tozier's testimony in the Fry Case, taken as a whole, does not warrant the finding that he there admitted the commission of a crime as charged in the deportation warrant.

The deportation proceedings appear to me to be in substance a breach of faith on the part of the government towards the petitioner. Technically, of course, the Immigration Department is not bound by the action of the Department of Justice. But it is part of, and acting in the name of, the same government, which, through its duly constituted officials in its law department, promised Tozier immunity if he would assist in making evident the truth of a serious crime. The first warrant was dismissed, very possibly because these considerations were represented to the department. Why proceedings were again instituted against him upon the same grounds does not appear; but some of the papers in the files suggest the disquieting possibility that the department may unintentionally have been misled into such action by persons animated by personal hostility to the petitioner. It cannot be too often repeated that administrative tribunals which exercise such tremendous powers over the liberty of persons, without the safeguards which experience had shown are necessary in court proceedings, and which are at once policeman, prosecutor, judge, and jury, are bound to a scrupulous regard for the rights of persons affected by their action.

Petitioner discharged.