EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JULIO LICEAGA, acusado y apelante.

## No. 4584 *

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. HUTCHISON

En la discusión de este caso se admitió que incumbía al fiscal probar el carácter voluntario de la confesión. Hay una admisión implícita al mismo efecto en la teoría de la opinión de la mayoría del tribunal en el sentido de que la voluntariedad de la confesión fué establecida por la prueba de cargo. Véase además 2 *Bishop's New Criminal Procedure*, 2ª ed., pág. 1052, sección 1232; la nota al pie del caso de *Commonwealth* v. *Dascalakis*, 38 A.L.R. 116, 120, III, "Peso de la Prueba", *b*.—"Criterio de que el peso recae sobre el gobierno", subtítulo "Confesiones a las autoridades"; *United States* v. *Wan*, 266 U.S. 1; y 16 C.J. 717, sección 1468, en que se citan quince casos de las decisiones de Puerto Rico en abono de la aserción de que:

"Una confesión de culpabilidad por el acusado es admisible contra él cuando—y sólo cuando—fué hecha libre y voluntariamente, sin previa inducción por la esperanza de un beneficio prometido o por el temor de un castigo en ciernes."

El acusado declaró que cuando fué registrado y se le despojó del dinero por el detective Cedeño en el cuartel, él aseveró que el dinero era suyo, y Cedeño dijo que la propiedad del dinero era algo que se estaba investigando, y que lo que ellos interesaban era que el acusado declarase como testigo en el caso de Sergio Plata; que ellos tenían información de que Sergio Plata era amigo del acusado y visitaba su casa; que el procesado le contestó que nada sabía de eso; que

Hernández (dueño de la tienda en que se perpetró el esca-
lamiento) cogió el dinero y se fué en su automóvil; que pos-
teriormente, como a las dos de la tarde, llegaron Pérez Sán-
chez y Susano (detectives) y le preguntaron a Cedeño: "¿Qué
hubo?" y Cedeño repuso: "Nada, que éste no quiere decir";
que uno de ellos dijo: "Ahora tú verás cómo dice"; que
entonces llevaron al acusado a un cuarto interior en que ha-
bía algunas camas y el procesado les preguntó si lo iban a
maltratar, y Susano y Pérez Sánchez entonces le advirtie-
ron que si no decía la verdad le romperían las costillas a
palos, que ellos no interesaban hacerle daño sino simple-
mente utilizarlo como testigo de cargo; que el acusado les
manifestó que nada podía decir porque nada sabía, que él
estaba durmiendo en su casa; que Pérez Sánchez le pre-
guntó: "¿No vas a decir nada?", le asestó una gaznatada,
y cogió un garrote, exclamando entonces el acusado: "Para
que ustedes no me peguen, ¿qué quieren que declare?"; que
entonces ellos le preguntaron si sabía dónde vivía Sergio
Plata y el acusado respondió: "No, señor, Sergio Plata
hace muchísimos días que no va a casa."

El resto de la declaración del acusado se refiere a los
detalles de una búsqueda de Sergio Plata en que el proce-
sado, según declaró en síntesis, fué utilizado como carnada,
respecto a lo cual ha sido corroborado en parte por los de-
tectives. No se adujo prueba de refutación.

Sólo dos testigos de El Pueblo dijeron algo en torno a
la voluntariedad de la supuesta confesión. Uno de ellos fué
el detective Pérez Sánchez. El otro fué Juan Hernández,
a quien se alude en la opinión de la mayoría.

Hernández declaró que como a las seis de la mañana
tuvo noticias del escalamiento; que fué inmediatamente a
la tienda y vió que la puerta había sido descerrajada y que
habían sido substraídos de la caja registradora cinco dó-
lares y algunos centavos; que entonces fué donde la de-
tective y volvió a la tienda con Cedeño; que él y Cedeño

luego fueron a un sitio cercano conocido por El Gandul, donde se encontraron con Liceaga en la calle; que lo arrestaron y lo condujeron al cuartel, donde fué interrogado; que posteriormente (no dice cuánto tiempo después) Liceaga le manifestó al testigo que iba a decir la verdad sobre todo lo ocurrido, y comenzó a decirle al testigo que él, Liceaga, y Sergio Plata, habían cometido el escalamiento; que Liceaga entonces le dijo al testigo, de su propia voluntad, que no había penetrado en la tienda, sino que había permanecido en vigilancia mientras Sergio Plata entraba a ella.

Lo expresado por Liceaga en el sentido de que él y Sergio Plata habían cometido el escalamiento era una plena confesión de culpabilidad. Hernández no dice que esa declaración fuera voluntaria.

La expresión posterior de que él no había penetrado en el establecimiento sino que vigilaba mientras Plata entraba, era explicativa de la participación de Liceaga en el delito, y probablemente la dijo con miras de exculpación. Esta es la manifestación que dice Hernández fué hecha por Liceaga espontáneamente, mas no la admisión precedente de que él y Sergio Plata perpetraron el escalamiento.

Si la anterior confesión de culpabilidad fué hecha bajo el influjo de alicientes impropios, la explicación posterior por el acusado de su participación en el delito así confesado (aparte de cualquiera cuestión respecto a si se hizo con fines exculpatorios o como una exposición de circunstancias atenuantes) no pudo ser voluntaria. A duras penas puede sostenerse la condena en la teoría de que Hernández quiso decir que la confesión anterior de culpabilidad no había sido obtenida mediante incentivos impropios.

Admitiendo a los fines de la argumentación que lo declarado por Hernández pudiera interpretarse razonablemente como significativo de que la totalidad de la confesión fué voluntaria—así lo entendió la mayoría—aun así, nada habría

que revele el significado de la palabra "voluntaria" usada por el testigo.

En *Hunt* v. *State*, 33 So. 329, 331, la Corte Suprema de Alabama dijo:

"Al sentar las bases para la admisión de prueba de confesiones, el curso adecuado es demostrar los hechos substantivos de que no se le hizo al acusado ningún ofrecimiento, promesa, o algo similar, y de que no fué objeto de amenazas o algo así, con el fin de extraerle las manifestaciones que se intenta demostrar hizo entonces. El que hiciera esas manifestaciones libre y voluntariamente, es una conclusión a ser inferida por la corte cuando los hechos substantivos la justifiquen, y no es al testigo a quien incumbe afirmarla."

Se ha dicho que "No es erróneo permitir a un testigo que declare que una confesión fué voluntaria, por tratarse de una opinión o conclusión, si las circunstancias de la confesión están en evidencia." 16 C.J. 733, sec. 1510. Además, que:

"El que una confesión sea voluntaria o no, depende en gran parte de los hechos de cada caso en particular." Id. 718, 1468.

La palabra voluntaria es "prácticamente incolora e inútil" como piedra de toque para determinar la admisibilidad de una confesión. 2 *Wigmore on Evidence,* 2ª ed. 154, sec. 831. ". . . . . Su significado es tan indefinido y vago que de por sí no proporciona una solución de las distintas situaciones con sus diferencias graduales . . . ." Id. 148, 149, sec. 826. "Si se tratara de escoger entre el potro y una falsa confesión, ésta sería considerada como lo menos desagradable; pero aun así se habría optado por ella voluntariamente . . . . Toda expresión consciente es y debe ser voluntaria; y lo que nos puede impeler a desconfiar de alguna, no es la circunstancia de que sea involuntaria, sino la circunstancia de que la elección de una confesión falsa sea algo natural bajo las condiciones imperantes." Id. 145, sec. 824.

Una buena ilustración de criterios divergentes respecto

a lo que constituye, o no, una confesión voluntaria, puede hallarse en *Wan* v. *United States, supra,* según aparece reportado en 266 U.S. y en 289 Fed. 908. Una comparación de los hechos expuestos en la opinión de la Corte de Apelaciones con los reseñados en la de la Corte Suprema, demostrará también hasta qué punto puede variar el color de un caso según el ángulo desde el cual se enfoque la prueba.

En el caso de *El Pueblo* v. *Cruz, ante,* 916, un testigo de cargo declaró en el examen directo que M, quien llevaba una vara en sus manos, no agredió a V antes de ser agredido por éste. En la repregunta, ese mismo testigo afirmó que M le había pegado a V con la vara, y entonces explicó esta contradicción diciendo que él no consideraba un azote con una vara como una agresión.

Así, pues, en el presente caso, una investigación posterior por el fiscal o por el juez sentenciador, o una repregunta hábil por un abogado de la defensa (si el acusado hubiera tenido defensor) pudo haber extraído la información de que el testigo de cargo Hernández no creía que una amenaza de violencia o una gaznatada no convertirían una confesión en involuntaria. Sin embargo, ''una amenaza de violencia corporal es el caso más claro de influencias que excluyen la confesión.'' 2 *Wigmore on Evidence,* 159, sec. 833.

Aun asumiendo a los fines de la argumentación que Hernández quiso significar que toda la confesión fué voluntaria, es muy posible, y hasta probable, que con esto él también tuvo en mente una u otra de dos cosas. Pudo haber querido decir que la confesión no se hizo en respuesta a pregunta alguna hecha a la sazón por él o por cualquiera otra persona. Pudo haber querido decir que no se hicieron amenazas en aquel momento.

La opinión de la mayoría asume demasiado. En primer término, asume que Hernández quiso decir que la totalidad de la confesión fué voluntaria. Luego asume que con esto Hernández también quiso decir que los detectives no ofre-

cieron o se valieron de medios impropios con el fin de obtener la confesión, bien en su presencia o de otro modo, o de que si de tales medios se había hecho uso, que los mismos habían dejado de surtir efecto. Una confirmación basada en una doble asunción de un carácter tan dudoso, viola la regla de que al acusado en una causa criminal se le presume inocente hasta que se pruebe su culpabilidad fuera de duda razonable.

La aseveración del acusado de que la alegada confesión fué hecha como a las dos de la tarde, permanece sin ser controvertida por ningún otro testigo. Hernández no dice por cuánto se prolongó el interrogatorio de Liceaga, ni cómo se llevó a cabo, ni si él estaba presente. Su declaración de que "después" Liceaga le hizo la confesión indica que no estaba presente. Su manifestación posterior de que él y Liceaga estaban solos cuando Liceaga expuso voluntariamente los detalles adicionales mencionados en la opinión de la mayoría, tiende a la misma conclusión.

Lo que se dice en la opinión de la mayoría en el sentido de que Hernández declaró que Liceaga había manifestado que Sergio Plata tenía la sortija, es un error. Lo más que se acerca a semejante aseveración en el testimonio de Hernández se halla en el siguiente extracto:

"F.—¿Y esto?
"T.—Ese dinero se le encontró a este señor.
"F.—¿Qué dinero se le encontró a él?
"T.—Se le encontraron dos paquetes de dinero, en uno de ellos había cuatro pesos, o menos, y en el otro no recuerdo, pero fueron dos paquetes.
"F.—Lo presento como prueba. ¿Y esta sortija?
"T.—Esa sortija era del encargado de la tienda, de Muñoz.
"F.—¿Faltó allí?
"T.—Sí, señor.
"F.—¿A quién se le ocupó esta sortija?
"T.—A Sergio Plata.
"F.—La persona que el acusado decía . . .
"T.—Sí, señor."

Según lo indican claramente los puntos suspensivos, este testigo anhelante no permitió que el fiscal terminara su pregunta. El testigo ya se había adelantado a informar que al ocupársele el dinero a Liceaga, éste le dijo al testigo que ellos se habían repartido el dinero, que Sergio Plata había cogido la mitad y Liceaga el resto. El testigo, en ninguna parte de su declaración, había imputado a Liceaga admisión alguna relativa a la sortija. Si pudiera suplirse la parte no acabada de la pregunta, la inferencia lógica sería que el fiscal se disponía a preguntar si Sergio Plata era la persona con quien Liceaga había dicho que se había dividido el dinero, o si Sergio Plata era la persona que, según Liceaga, había penetrado en la tienda mientras Liceaga vigilaba afuera. No hay base para la inferencia de que el fiscal se disponía a preguntar si Sergio Plata era la persona que, según Liceaga, tenía la sortija, porque el testigo Hernández no había puesto en labios de Liceaga semejante aserción. Esa omisión no puede propiamente suplirse por la interpolación, en un caso criminal, de una admisión tan perjudicial al acusado como la supuesta manifestación a Hernández de que ''Sergio Plata tenía la sortija.''

El acusado en una causa criminal tiene algunos derechos que tanto el fiscal como el juez están en el deber de respetar. Entre ellos está el derecho a un juicio imparcial.

En el caso de *El Pueblo* v. *Valle*, 29 D.P.R. 555, este tribunal expresó:

''Los fiscales de distrito son letrados que deben conocer la Ley Criminal especialmente con pleno dominio sobre ella, y deben ser los primeros en respetar los derechos de los acusados. Cuando esta actitud se sigue constante y firmemente por su parte, un gran prestigio moral y una autoridad que influye por sí misma, son la consecuencia de ello. No se debe preguntar como se preguntó aquí a un policía: '¿Tuvo sospechas con quién?' Ni se debe introducir una admisión sin demostrar antes que era en verdad voluntaria.''

Eso se dijo en un caso en que al acusado lo representaba un abogado, y un policía había declarado que la ad-

misión de que se trataba fué hecha voluntariamente a presencia del testigo de cargo y de otras personas.

En el presente caso, el acusado no tenía defensor. No hay una sola objeción o excepción en todo el récord. La primera tentativa fútil que hizo el acusado en la repregunta, amén de haber dejado él de oponerse a flagrantes violaciones de las reglas de evidencia perpetradas por el fiscal, debió haber informado a la corte de que el acusado era de todo punto inhábil para conducir su propia defensa. En lo que toca a una ulterior discusión de la declaración de Hernández, se copiará lo bastante del récord que indique la manera en que se celebró el juicio. Es éste un aspecto del caso que debió recibir seria consideración al resolverse el presente recurso.

Volviendo ahora al texto que sigue a la parte de la declaración de Hernández en que él dijo que Liceaga le había manifestado, de propia voluntad, que no había penetrado en la tienda sino que había permanecido en vigilancia mientras Sergio Plata entraba, el fiscal le preguntó al testigo qué era lo que Liceaga vigilaba, no si Liceaga había hecho alguna manifestación a este respecto. El testigo contestó que Liceaga velaba "si venía alguna persona", y continuó diciendo que toda vez que la tienda daba a la calle y el candado estaba en la puerta del frente, Liceaga "se quedó velando si venía alguien." A reserva de lo demás que pudiera decirse de esta contestación, por lo menos respondía a la pregunta.

Luego el fiscal procedió a poner en boca del testigo de cargo la aserción adicional de que Liceaga había dicho que estaba vigilando "de acuerdo con Sergio Plata", mientras éste cometía el escalamiento. Después de responder a una pregunta sugestiva a ese efecto en la afirmativa, el testigo agregó que entonces, al ocupársele el dinero a Liceaga, éste le manifestó al testigo que ellos se habían repartido el dinero, que Sergio Plata había cogido la mitad y Liceaga la

otra mitad. En este punto el récord taquigráfico continúa como sigue:

"F.—¿Eso se lo dijo el acusado?
"T.—Sí, señor.
"F.—¿Voluntariamente?
"T.—Voluntariamente.
"F.—¿Quién más estaba allí cuando él decía eso?
"T.—Nosotros nos quedamos solos.
"F.—¿Quiénes son nosotros?
"T.—El y yo.
"F.—¿Ud. le hizo alguna oferta a este hombre para que dijera eso?
"T.—Nada absolutamente.
"F.—¿Ud. le obligó a declarar?
"T.—Absolutamente nada.
"F.—¿Lo amenazó?
"T.—Nada absolutamente."

Este coloquio se refiere, por supuesto, a la aseveración que inmediatamente lo precede respecto a lo que Liceaga dijo acerca de una repartición del dinero, o, a lo sumo, a esa parte de la supuesta confesión ya caracterizada por Hernández como voluntaria, mas no a la admisión previamente hecha por Liceaga que es la médula de la alegada confesión y que no se ha demostrado que fuera voluntariamente hecha, a saber, de que Liceaga había cometido el escalamiento de marras.

La afirmación de que Liceaga habló voluntariamente de la división del dinero, al igual que la previa manifestación en cuanto a una acción concertada, no era tanto la declaración del testigo de cargo como la del fiscal hablando por mediación del testigo. Hernández no era un testigo hostil. Tampoco era un testigo desinteresado. Lo menos que puede decirse en torno a este aspecto del caso es que si al acusado lo hubiera defendido un abogado, no es probable que el fiscal tratara de emplear este método de preguntar, o de que esa tentativa hubiera resultado con éxito ante una objeción oportuna del abogado.

La declaración de Hernández de que él mismo no obligó a Liceaga a confesar, ni le hizo ofrecimientos ni amenazas, no puede, por más que se fuerce la imaginación, tergiversarse de modo que se convierta en la aserción de que no se utilizaron tales medios por los detectives, bien en presencia del testigo o no.

La declaración del detective Pérez Sánchez, en cuanto se relaciona con la voluntariedad de la confesión, lee así:

"F.—¿Que participación dijo que había tomado?

"T.—Que estaba frente al establecimiento mientras Sergio estaba dentro, que él velaba.

"F.—¿Esa manifestación cómo la hizo él?

"T.—Voluntariamente.

"F.—¿Allí en alguna ocasión se le dió a este acusado con un palo o un 'black jack'?

"T.—No, señor.

"F.—¿Ud. le hizo alguna oferta?

"T.—No, señor.

"F.—¿Alguna promesa o dádiva?

"T.—No, señor.

"F.—¿Se habló allí algo de testigo de El Pueblo de Puerto Rico?

"T.—No, señor.

"F.—¿El entonces hizo esa manifestación voluntariamente?

"T.—Voluntariamente.

"F.—¿Ud. le puede asegurar a la Corte que no hubo coacción ni amenaza, ni promesa?

"T.—Estaba el paisano Hernández allí ese día."

El acusado no dijo haber sido golpeado con una macana o un "blackjack". Su afirmación fué que Pérez Sánchez lo amenazó con romperle las costillas con un palo, le dió una gaznatada, y sacó la macana, no que fué golpeado con una macana o un "blackjack". Tres detectives participaron en la "investigación" que se practicó en el cuartel de la policía. El hecho, de serlo, de que Pérez Sánchez no hizo ofrecimiento o promesa alguna, no prueba que alguno de los otros detectives no se valió de medios ilícitos para lograr la supuesta confesión. La aseveración de que nada se ha-

bló acerca de que el acusado se hiciera testigo de El Pueblo, viene algo más al caso, pero no es suficiente, sin más, para establecer el carácter voluntario de la confesión. Cuando al testigo se le preguntó si él podía asegurarle a la corte que no hubo amenaza, coacción, ni promesa, su respuesta de que Hernández había estado allí ese día, era una palpable evasión de la pregunta. El fiscal no insistió en una respuesta, y la pregunta no se repitió.

Tanto Hernández como Pérez Sánchez dicen que la explicación de Liceaga en cuanto a lo que hacía mientras Sergio Plata penetraba en la tienda, fué voluntaria. Fuera de esto, la declaración de Pérez Sánchez agrega poco o nada a la de Hernández en lo atinente a la voluntariedad de la confesión.

Julio Liceaga fué arrestado sin mandamiento. El no estaba escondido, sino que fué hallado sin dificultad en la calle. El hecho de que fuera previamente declarado reo de otros delitos, no constituía de por sí una causa razonable para creer que había cometido el escalamiento. *State* v. *District Court*, 233 Pac. 126. El arresto era ilegal. El no fué llevado ante ningún magistrado instructor, sino directamente al cuartel de la policía, donde se practicó la "investigación" que dió por resultado la confesión de culpabilidad. Si al cabo de esta "investigación" o en cualquier otro momento fué conducido ante un magistrado, los autos no lo revelan. Su detención en el cuartel de la policía también fué ilegal.

Estas circunstancias son significativas. No debieron pasar inadvertidas por el juez de distrito, ni debieron ser ignoradas por la mayoría del tribunal al disponer de este caso en apelación.

Si no se siguen las claras disposiciones de la ley, debe darse alguna explicación, y, a falta de ésta, debe exigirse prueba convincente de la voluntariedad de la alegada confesión. *A fortiori*, si además de esta falta, no explicada,

de obediencia a la ley, la supuesta confesión es práctica-
mente la única evidencia que tiende a conectar al acusado
con la comisión del delito, la escueta afirmación de un tes-
tigo de que esa confesión es voluntaria no .debe estimarse
suficiente para sostener una condena.

En *El Pueblo* v. *Sierra, ante,* 504, la evidencia tendiente
a demostrar que la confesión hecha por Alfonso López no
había sido obtenida por medios torcidos, tal como aparecía
al tiempo de admitirse la confesión, dejaba mucho que de-
sear. Aun entonces, sin embargo, era más fuerte que la
del presente caso. En el caso de Sierra, hubo por lo me-
nos algún testimonio en refutación de la declaración hecha
por López en la silla testifical en cuanto a la manera en que
se obtuvo su confesión. Esta prueba de refutación—de ser
cierta—unida a la previa declaración del jefe de la detec-
tive—de ser cierta también—era suficiente para establecer
el· carácter voluntario de la confesión. Ello no obstante, la
mayoría de este tribunal prefirió basar la confirmación en el
fundamento más dudoso de omisiones técnicas en el alegato
del apelante, y en renuncia, consentimiento y falta de la de-
bida objeción en la corte inferior. El hecho prominente de
que la misma mayoría optó en este caso por basarse en la
evidencia ·más bien que en fundamentos técnicos, releva al
que suscribe de la necesidad de demostrar que la adopción.
de cualquier otro curso bajo las circunstancias de este caso
hubiera sido injusta.

*El Pueblo* v. *Sierra* fué un caso notorio de asesinato en
primer grado. Si la doctrina del mismo ha de ser interpre-
tada a la luz de hechos divulgados por el récord pero no con-
signados en la opinión, y si el caso entonces ha de seguirse
como precedente, puede sentar jurisprudencia muy dudosa.
El caso de autos no es en sentido alguno un caso difícil. No
debió establecer un mal precedente.

*La sentencia apelada· debió ser revocada.*