**Thomas E. BLUNT, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Thomas E. BLUNT, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Misc. 704; Nos. 13294–13296.**

United States Court of Appeals District of Columbia Circuit.

Argued March 18, 1957.

Decided April 18, 1957.

Petition for Rehearing In Banc Denied May 14, 1957.

---

Mr. David Lloyd Kreeger, Washington, D. C., appointed by this Court, with whom Mr. Thomas J. Schwab, Washing-

ton, D. C., was on the brief for the petitioner in Misc. 704.

Mr. Fred L. McIntyre, Asst. U. S. Atty., with whom Mr. Oliver Gasch, U. S. Atty., and Mr. Lewis Carroll, Asst. U. S. Atty., were on the brief for the respondent in Misc. 704.

Before EDGERTON, Chief Judge, and BAZELON and WASHINGTON, Circuit Judges.

BAZELON, Circuit Judge.

In July and August 1952, Thomas Blunt, an 18-year old boy, was indicted for five robberies and a housebreaking and larceny, all committed in four weeks of June 1952. At his July 25th arraignment, the court ordered a psychiatric examination pursuant to 18 U.S.C. § 4244.[1] The psychiatrists found that Blunt was of unsound mind, suffering from a psychosis. At a hearing in September 1952, he was judicially found incompetent to stand trial and was committed to St. Elizabeths Hospital. He remained there until the hospital superintendent stated, in a letter dated August 13, 1953, that he was competent to stand trial. In October 1953, without any judicial determination of restored competency, he

was tried and convicted on three charges of robbery.[2] He had theretofore never been convicted of a crime. The trial judge imposed three separate sentences of 32 months to 8 years, to run consecutively.[3] Thus Blunt faced 8 to 24 years in prison.

■ After serving more than two years, Blunt *pro se* filed a motion in December 1955 to vacate the sentences under 28 U.S.C. § 2255. He alleged that, since there had been no pretrial judicial determination of restored competency, his convictions were defective, citing Gunther v. United States, 1954, 94 U.S. App.D.C. 243, 215 F.2d 493. The motion was heard by the district judge who had tried and sentenced Blunt. He denied it without hearing. He also denied leave to appeal in forma pauperis. Blunt then moved in this court for leave to appeal in forma pauperis and for appointment of counsel.[4] We granted both requests[5] since the reasons given by the trial judge for denial of the § 2255 motion without a hearing were plainly erroneous.[6]

Upon examination of the District Court docket entries and other investigation, the counsel we appointed to rep-

---

1. 63 Stat. 686 (1949).

2. The three indictments on which Blunt was tried charged robberies on June 1, 21 and 24, 1952. The cases were consolidated for trial by agreement of the parties. The housebreaking indictment and a fourth robbery indictment were dismissed by the Government on November 24, 1953. The remaining robbery charge was dismissed for want of prosecution on January 4, 1956.

3. The judge noted:
 The Court might add that there is a "tendency in certain quarters nowadays to consider the welfare of the defendant, but we must not lose sight of the victims of crimes and not let them become the forgotten men of law enforcement."

4. Application filed January 18, 1956, in Misc. 615.

5. Per curiam order dated March 9, 1956, in Misc. 615, now cases Nos. 13294, 13295 and 13296.

6. The judge filed a memorandum denying relief under § 2255 for four reasons.

Two of the reasons were that competency to stand trial is not subject to collateral attack and that the issue is waived if not advanced at the trial. But the issue is clearly reviewable under § 2255. Sanders v. Allen, 1938, 69 App. D.C. 307, 100 F.2d 717; Bishop v. United States, 1955, 96 U.S.App.D.C. 117, 223 F.2d 582, certiorari granted and judgment vacated, 1956, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835, the Supreme Court saying:
 "The judgment is vacated and the case is remanded to the District Court for a hearing on the sanity of the petitioner at the time of his trial."
As plainly erroneous are the trial judge's other two reasons: (1) that petitioner did not allege he was in fact mentally incompetent when tried; and (2) that a recent statutory amendment, presumably Public Law 313, Aug. 9, 1955, amending D.C.Code, § 24–301, abrogated the requirement for a judicial determination of restored competency.

resent Blunt in his appeals from the denial of his § 2255 motion, discovered the following facts: On October 30, 1953, when Blunt was sentenced, his trial counsel presented to the trial judge an application, in the usual affidavit form, seeking leave to appeal in forma pauperis from the judgments of conviction. The judge indicated orally that he would grant leave to file a notice of appeal without prepayment of costs, but would not order the transcript to be furnished at the expense of the United States. Three days later, when Blunt was in jail and no longer had counsel,[7] the Clerk of the District Court filed the application with an endorsement by the judge, "Let the defendant file notice of appeal without prepayment of costs." It does not appear that either Blunt or anyone on his behalf was notified of this action.

On the basis of these newly discovered facts counsel immediately petitioned us for leave to prosecute Blunt's appeals from the judgments of conviction, and for an order directing preparation of the trial transcript at Government expense.[8] We ordered the transcript but, pending its study by counsel for both sides, withheld decision as to allowing prosecution of the appeals from the convictions.[9] Pursuant to this court's sua sponte order of February 18, 1957, the parties have fully briefed and argued both the question whether the appeals may be prosecuted and the merits of the appeals them-

selves. We first consider the questions relating to our jurisdiction.

## I. Jurisdictional Issues

### A. Adequacy of Notice of Appeal.

■ Though the District Court declined to provide Blunt a transcript at Government expense, it endorsed his application, "Let the defendant file notice of appeal without prepayment of costs." Because Blunt did not within ten days thereafter file a paper formally denominated "notice of appeal," the Government now argues that we have no jurisdiction to entertain his appeals. But Blunt's timely application for leave to appeal in forma pauperis was, in the circumstances, an unequivocal notification of intention to appeal and therefore a "notice of appeal" sufficient to give this court jurisdiction under Rule 37(a), Fed.R.Crim.P. 18 U.S.C. Williams v. United States, 1951, 88 U.S.App.D.C. 212, 188 F.2d 41; Boykin v. Huff, 1941, 73 App.D.C. 378, 121 F.2d 865.

### B. Timeliness of Pursuit of Appeals.

■ The rules allowed Blunt three days to file a statement that the stenographic transcript had been ordered from the reporter,[10] and forty days to file the record.[11] But for more than two years, he did nothing. The Government says he thereby "abandoned" his appeals.[12] We conclude, instead, (1) that Blunt made timely efforts to pursue

---

7. At the sentencing counsel said to the court, "This boy's family has informed me that they wanted to get other counsel to handle his appeal, and this, of course, will be the last thing that I might do on his behalf." No other attorney entered an appearance in the case until we appointed present counsel.

8. Petition filed July 27, 1956, in Misc. 704.

9. Per curiam order dated August 31, 1956, in Misc. 704. Of our own motion we ordered transcripts of the arraignment and sentencing. Per curiam order dated January 9, 1957, in cases Nos. 13294, 13295 and 13296.

10. Rule 33(b) of the General Rules of this court, prior to amendment on June 18, 1956, 28 U.S.C.A. Under the amend-

ed rule the period is now ten days in such cases as Blunt's.

11. Rule 39(c), Fed.R.Crim.P.

12. Rule 73(a), Fed.R.Civ.P. 28 U.S.C., made applicable to criminal cases by Rules 9 and 33(g) of the General Rules of this court, provides: "A party may appeal from a judgment by filing with the district court a notice of appeal. Failure of the Appellant to take any of the further steps to secure the review of the judgment appealed from does not affect the validity of the appeal, but is ground only for such remedies as are specified in this rule or, when no remedy is specified, for such action as the appellate court deems appropriate, which may include dismissal of the appeal."

his appeals; and (2) that, if not, delay was "the result of excusable neglect," Rule 45(b) (2), Fed.R.Crim.P., and pursuit of the appeals must be allowed in the interests of justice.

Blunt, a pauper, could not himself order a transcript. But with the filing of his notice he asked the District Court for a transcript at Government expense. He had no occasion to ask us for a transcript until the District Court had effectively denied his request. The District Court's denial of his request was not entered until November 2, 1953, when Blunt was already in jail and no longer had counsel.

Rule 49(c) of the Federal Rules of Criminal Procedure provides:

> "Immediately upon the entry of an order made on a written motion subsequent to arraignment the clerk shall mail to each party affected thereby a notice thereof and shall make a note in the docket of the mailing."

Concerning the similar provision in the Rules of Civil Procedure, the Supreme Court said in Hill v. Hawes, 1944, 320 U.S. 520, 523, 64 S.Ct. 334, 336, 88 L.Ed. 283.

"It is true that Rule 77(d) does not purport to attach any consequence to the failure of the clerk to give the prescribed notice; but we can think of no reason for requiring

the notice if counsel in the cause are not entitled to rely upon the requirement that it be given." [13]

Since no notice was sent to Blunt or to anyone on his behalf, the time to take the next step in his appeals did not begin to run until March 1956, when counsel we appointed acquired actual notice, from the District Court files, of the order of November 2, 1953. Lohman v. United States, 6 Cir., 1956, 237 F.2d 645, and cases there cited.[14]

■ We need not consider whether actual notice of the order of November 2, 1953, would have dispensed with the requirement of formal notice of its entry on the docket,[15] for there is no showing that Blunt had actual notice. The transcript shows that on October 30, 1953, when Blunt was sentenced and the application for a transcript was filed, the judge said, in the presence of Blunt and his counsel:

> "I *will allow* you to file a notice of appeal without prepayment of cost, but I *will not permit* the matter to go further in forma pauperis without a further showing." [16]

But the order was not entered by the clerk until November 2, 1953, and it does not appear that the judge signed it earlier. The Government would have us assume that he signed it on October 30 when he stated what he *would* do. We see no basis for this assumption.[17]

13. See Carter v. United States, 10 Cir., 1948, 168 F.2d 310, 311, applying the Supreme Court's observation to Rule 49 (c), Fed.R.Crim.P.

14. The Government would limit the Lohman rule to cases in which appellant could not ascertain that the order had been entered. This limitation was specifically rejected in Lohman. The district court order there reversed had been based upon the conclusion that counsel "either knew the time of filing the order or by the slightest inquiry could have ascertained it." 237 F.2d at page 646.

15. The Government cites Gonzalez v. United States, 1 Cir., 1956, 233 F.2d 825; and Huff v. United States, 5 Cir., 1951, 192 F.2d 911, certiorari denied

1952, 342 U.S. 946, 72 S.Ct. 560, 96 L. Ed. 703. See, contra, our recent decision in Conway v. Pennsylvania Greyhound Lines, 1957, 100 U.S.App.D.C. —, 243 F.2d 39.

16. Emphasis here and hereinafter supplied.

17. In an affidavit of July 23, 1956, Blunt says in substance that he saw the judge sign the order, but this means only that he saw him write on the application, not that he saw what was written. No claim of actual notice of the order, therefore, could be based on this statement. Moreover, Blunt had but recently been released from a mental hospital; one of the attending psychiatrists testified that he was still not "entirely recovered"; and, though certified by the

### C. Excusability of Delay.

If we thought, as we do not, that Blunt's time to take further steps in pursuit of his appeals commenced to run on November 2, 1953, we would hold that the delay until March 1956 was the result of excusable neglect, and would therefore review the convictions.

From the day he was sentenced until March 9, 1956, Blunt was in prison and without counsel. Whether he knew he had been allowed to appeal is very doubtful. The judicial determination, still outstanding, that he was incompetent to stand trial, applies equally to every step involved in prosecuting an appeal. We must conclude that his neglect to do anything until we appointed new counsel was excusable. In the face of the very substantial questions [18] raised by the appeals as to the lawfulness of the convictions, we would defeat the interests of justice if we refused to entertain the appeals. As we said in Christoffel v. United States, 1950, 88 U.S.App.D.C. 1, 6, 190 F.2d 585, 590:

"* * * in a criminal case in which a sentence of imprisonment is involved, there is a public interest against denial of consideration on appeal of substantial questions as to the lawfulness of the conviction. For if the conviction is erroneous it is abhorrent to justice that a defendant shall nevertheless suffer such a penalty for the crime charged.[19]"

### II. The Substantive Issues

The three taxicab drivers who were victims of the robberies, a jeweler who bought one of the stolen articles, and a policeman to whom Blunt orally confessed were the Government witnesses. Their testimony showed that the three robberies were committed in similar fashion: During the early morning hours, Blunt hired a taxicab and directed the driver to a desolate place; upon arrival, he offered a large bill in payment of the fare and, when the driver produced change, Blunt, by force or threats of force, took the driver's money and valuables and fled.

The defense was insanity. It was sought to be established by the following evidence:

(1) Blunt, the first defense witness, had reasonably clear recollection of events prior to his entry into the Army. He remembered that while in the Army he was hospitalized for leg and shoulder injuries and a slight brain concussion. He stated that he returned to the District of Columbia after a medical discharge in January 1952, and since his discharge had "blank[ed] out * * * [q]uite a few numbers of times." He said he remembered nothing about the crimes, the victims, the police lineup, the arraignment, or being sent to jail. He recalled being treated at St. Elizabeths by insulin shock. He stated that he felt rational at the time of trial.

(2) Blunt's mother gave an account of his odd behavior after his return from the Army.

(3) The defense called Dr. Amino Perretti, Assistant Chief Psychiatrist at the District of Columbia General Hospital, who testified that, pursuant to

---

hospital as competent to stand trial, he had not been judicially determined to be competent. We need not go so far as to say that any actual notice to him could have had no legal effect. For present purposes, it is enough to say that until there has been a judicial determination of restored competency, one who has been judicially determined to be incompetent is—at least prima facie—legally incapable of making the choices involved in such processes as abandonment, waiver or consent. Cf. Taylor v. United States, 1955, 95 U.S.App.D.C. 373, 378, 222 F.2d 398, 403.

The trial court's failure to make a judicial determination of restored competency before trial is the ground of the pending § 2255 appeals. In view of our disposition of the direct appeal from the convictions, we do not consider the question involved in the § 2255 appeals.

18. See Pyramid Motor Freight Corp. v. Ispass, 1947, 330 U.S. 695, 704–705, 67 S. Ct. 954, 91 L.Ed. 1184.

19. See United States v. Ohio Power Co., 77 S.Ct. 652.

court order, he examined Blunt four times in August and September 1952, beginning about a month and a half after the last robbery. In his opinion Blunt was suffering from psychosis—dementia praecox—could not differentiate between right and wrong,[20] and had been in that mental state on June 1, 1952, the date of the first robbery.

(4) Dr. Epstein, a psychiatrist on the staff of St. Elizabeths Hospital, testified that he had found Blunt psychotic in a series of examinations beginning in December 1952, when Blunt was admitted to the hospital. Dr. Epstein said he was unable to form an opinion as to Blunt's mental condition in June 1952 when the alleged crimes were committed.

(5) The last defense witness, Dr. Gilbert, Chief Psychiatrist of the District of Columbia General Hospital, testified that, pursuant to court order, he had examined Blunt three times in August and September 1952. Like Dr. Perretti, he testified unequivocally that in his opinion Blunt had been psychotic and unable to distinguish right from wrong at the times of the offenses charged.

The Government introduced no rebuttal evidence. To discharge its burden of proving the accused's sanity, as required by Davis v. United States, 1895, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499, the Government apparently relied upon the circumstances of the alleged crimes as implying Blunt's capacity to plan and upon the testimony of one of the victims that Blunt had not acted unusually.

That the jury, despite the overwhelming weight of the evidence of insanity, failed to return a verdict of acquittal by reason of insanity is attributable, Blunt's counsel tells us, to a series of errors committed by the trial judge. We think the errors are plain and require reversal of the convictions.

**A. Erroneous Characterization of the Evidence.**

The trial judge conveyed to the jury highly improper characterizations of important evidence:

**1. As to whether Blunt had "planned" his acts.**

The Government's witnesses described Blunt's acts. If the jury wished to infer from his acts that they were planned, we could not disturb their inference. There was, however, no direct evidence that the acts were planned. Indeed, Dr. Gilbert testified that, in his opinion, Blunt's acts had not been planned. At most, therefore, whether the acts were planned was an issue to be determined by the jury.[21] If they concluded the acts were not planned, but were, as Dr. Gilbert said, manifestations of panic characteristic of Blunt's mental illness, it cannot be said the jury would nevertheless have convicted Blunt.

The trial judge obviously believed that Blunt had planned his acts. Whether, within his power to comment on the evidence, it would have been proper for him to convey his *belief* to the jury is not the question here.[22] He did not tell the jury he *believed* the acts had been planned. He told them, in colloquies

---

20. Since the trial took place before our decision in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, the right-wrong and irresistible impulse tests were applicable.

21. Evidence of capacity to plan, although it may be relevant to mental condition, by no means negates mental illness. As Dr. Gilbert testified, "Many mental cases are quite capable of planning." Moreover, as he further testified, even if Blunt had planned his acts, he would have done so without realization of wrong.

A criminal act "may be coolly and carefully prepared; yet * * * still the act of a madman." Royal Commission on Capital Punishment 1949–1953 Report (Cmd. 8923) 110 (1953), cited in Durham v. United States, 94 U.S.App. D.C. at page 240, 214 F.2d at pages 873–874.

22. In Billeci v. United States, 1950, 87 U.S.App.D.C. 274, 282, 184 F.2d 394, 402, 24 A.L.R.2d 881, we said: *"In exceptional cases* he may even express his opinion upon the evidence, or phases of it."

with defense psychiatrists and in his instructions, that *the acts had in fact been planned,* thus taking from the jury an issue which was for them to decide.

He put these questions to Dr. Perretti:

"Q. * * * do you mean to say that while *planning* this robbery, because *it must have been planned,* while committing it, and the selling of an article, the proceeds of the robbery, that he didn't know that it was wrong to do all this?

\* \* \* \* \* \*

"Now, is it your opinion that when *he planned* these robberies and carried them out, and sold some of the proceeds of the robbery, that he thought that it was all right to do it?

\* \* \* \* \* \*

" * * * is it your opinion that he thought when *he planned* these robberies and carried them out and disposed of the proceeds of the robberies that it was perfectly right to do all this?

\* \* \* \* \* \*

"He did not realize it was wrong to *plan* a robbery, to yoke his victim, and to rob him and then to sell the proceeds of the robbery?

\* \* \* \* \* \*

"But you are not willing—am I correct in drawing the inference that you are not willing to say categorically that he did not know it was wrong to commit these robberies after *planning them* and carrying them out?

\* \* \* \* \* \*

"But you are not willing to make the sworn statement that this defendant at the time *he planned, because all these robberies were planned,* at the time *he planned* these robberies, hailed these cabs, sat in the cab as a passenger, waited until the cab arrived at a desolate, dark spot and then he engaged the taxi driver in conversation, and finally yoked and robbed him, or in one case beat him up, and then a day or two later he sold the watch that was a part of the loot, that even though he was able to carry out all these things would you say he didn't know they were wrong? * * * "

In his instructions to the jury, the judge said:

" * * * Each [*of the crimes*] *followed the same pattern.* Each of them apparently *must have been carefully planned* and carefully executed."

2. As to the basis of the psychiatric testimony.

 As we have stated, Dr. Perretti testified that in his opinion, based upon his examinations during August and September 1952, Blunt was suffering from dementia praecox and could not distinguish between right and wrong, and that the condition had been in existence at least as far back as June 1, 1952, the date of the first act charged against him. Cross-examination left this testimony unshaken. When the prosecutor had finished, the judge commenced an interrogation of the witness that occupies seven pages of the transcript. By insistent questioning, the judge sought to establish, *inter alia,* that Dr. Perretti's testimony was entitled to little weight because not based on fact; *e. g.:*

"Q. So that on June 1st this defendant may have been able to differentiate between right and wrong. A. I don't believe so. I believe at that time he had these same symptoms that I elicited at the time of the first examination [in August].

"Q. Of course *you don't know that.* A. * * * since these symptoms were quite pronounced my conclusion was that * * * he possessed them on June 1st, that he could not differentiate between right and wrong * * *.

"Q. *But you don't know* whether those symptoms were present on June 1st. You examined him on August 1st—do you? A. Yes, I do; Yes, I believe so. Even though I did not examine the patient in

June \* \* \*. It is purely a psychiatric opinion based on experience and judgment of the psychiatrist \* \* \*.

"Q. *That is just a feeling, then.* A. *No, it is an opinion.*

"Q. *But an opinion not based on fact.* A. It is based on the examination I conducted initially."

If the judge succeeded in conveying to the jury his obvious conclusion that Dr. Perretti's medical opinion was "just a feeling" or, if an opinion, "not based on fact," the conclusion would be equally applicable to the similar testimony of Dr. Gilbert. That this was what the judge intended is shown by his instructions to the jury on this point:

"Now in determining how much weight to accord to the testimony of these two psychiatrists you may desire to accord such weight as you deem proper to the fact that they did not see and did not examine the defendant until August, 1952, while

the robberies were said to have been committed during the previous June. *The doctors' opinion was not therefore based on actual observation or on actual facts,* but on conclusions drawn from an examination held *considerably* [23] after the commission of the offenses."

As an expert witness, the psychiatrist is permitted to testify to his inferences from facts. His *opinions* are exactly what is sought. And these opinions may be based upon facts he has himself observed, or facts he has heard others relate,[24] or hypothetical facts presented to him. The purpose of employing an expert witness is to obtain for the jury the benefit of his educated conclusions. He must give the jury the type of clinical opinion he is accustomed to form and to rely upon in the practice of his profession. This is what the psychiatric witnesses did in this case. Though their conclusions were not mathematically demonstrable certainties,

23. Presumably the less time that elapses between the act and the psychiatric examination, the more accurate will be the medical opinion. Blunt's case, in this respect, follows the pattern displayed by so many of the cases coming before us. The accused and his family have extremely limited financial and intellectual resources. He is found to be mentally ill soon after he falls into the hands of the law. From that point on, others than he determine what happens to him. Government doctors, appointed by the court, take him in charge. If there is delay in examining him, they, not he, are responsible for it. Moreover, if their examinations are inadequate in that they do not gather enough information to pin-point the origin of his illness, they are remiss, if anyone; certainly not he. Their examinations, made for the purpose of determining his competency to stand trial, 18 U.S.C. § 4244, require less than examinations designed to determine sanity for the purpose of criminal responsibility. If the examinations they made are relatively deficient for the latter purpose, the deficiencies could have been remedied by the prosecutor, who knew from the beginning that insanity at the time of the crimes would be the critical issue in any trial ultimately held. Yet the prosecutor makes no challenge to the psychiatrist's testimony at the time of the hearing under § 4244 and seeks no more extensive psychiatric examination. He simply waits until the accused's competency to be tried is restored, which may be many months and sometimes years later, and then, at the trial, when the accused offers the testimony of these Government psychiatrists to prove he was insane when he committed the acts charged against him, the prosecutor denounces the psychiatrists as unscientific and unreliable.

The cross examination of Drs. Perretti and Gilbert was, in this respect, typical. The inherent unfairness of the system was compounded by the judge. The examinations of Blunt by the two doctors occurred between two and three months after the acts charged. Whether that time lapse would be enough, in the light of the prosecution's attack on the psychiatrists, to persuade the jury that the psychiatric opinions should be rejected, is something we cannot know. For the court, however, to categorize the lapse of time as "considerable," is improper, for it implies the testimony is of little worth.

24. The psychiatric witnesses were permitted to be present during the testimony of the other witnesses.

neither were they mere conjectures, suspicions or hunches.

■■■■■ The judge implied the contrary. His assertions were not within the judicial privilege to analyze and comment upon evidence. That privilege must "be exercised in conformity with the standards governing the judicial office." Quercia v. United States, 1933, 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321; see also Billeci v. United States, 1950, 87 U.S.App.D.C. 274, 282–283, 184 F.2d 394, 402–404; and United States v. Brandt, 2 Cir., 1952, 196 F.2d 653, 655–656. The judge "may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it." What he says " 'should * * * not * * * mislead' " and " 'deductions and theories not warranted by the evidence should be studiously avoided.' " Quercia v. United States, supra, 289 U.S. at page 470, 53 S.Ct. at page 699, quoting Starr v. United States, 1894, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841. As the Supreme Court said in Quercia, 289 U.S. at page 471, 53 S.Ct. at page 700: "In the instant case, the trial judge did not analyze the evidence; he added to it, and he based his instruction upon his own addition."

When it is the judge who undertakes to supplement the evidence, the harm is even greater than when the prosecutor does it, for "the influence of the trial judge on the jury is necessarily and properly of great weight, and * * * his lightest word or intimation is received with deference, and may prove controlling." Starr v. United States,

supra, 153 U.S. at page 626, 14 S.Ct. at page 923. Such conduct by the judge is a fatal "cut into the presumption of innocence to which defendants are entitled." United States v. Brandt, supra, 196 F.2d at page 656. Principles designed to protect this presumption "are not pious platitudes recited to placate the shades of venerated legal ancients. They are working rules of law binding upon the court." Billeci v. United States, 87 U.S.App.D.C. at page 283, 184 F.2d at page 403.

■■■■ What the judge did here took on the aspect of advocacy.[25] Although he put a few questions to witnesses for the prosecution, his interrogations were largely confined to defense witnesses. The judge may, of course, properly participate in the examination of the witnesses for the purpose of elucidating their testimony in order to assist the jury. But, as was said in Blumberg v. United States, 5 Cir., 1955, 222 F.2d 496, 501:

"* * * it is far better for the trial judge to err on the side of abstention from intervention in the case rather than on the side of active participation in it, especially when the major part, if not all of his interruptions and interventions, though by chance rather than by design, are, or seem to be, on, or tending to be on the side of the government."

See also Starr v. United States, supra, 153 U.S. at page 626, 14 S.Ct. at page 923. The constitutional guarantee of trial by jury limits the judge's role. "* * * [he] cannot be argumentative

25. The role the trial judge played in this case cannot be justified by a concern for the welfare of society. See supra note 3. As we said in Billeci v. United States, 87 U.S.App.D.C. at page 283, 184 F.2d at page 403:

"The public interest requires that persons who have committed crimes be convicted of them. But the responsibility for producing the evidence which will persuade twelve jurors of guilt beyond a reasonable doubt is upon the prosecutor. It is a serious public responsibility, but it is upon the prosecutor and upon him alone. The judge has no part in that task. The prosecutor represents society in the prosecution. The attorney for the defense represents the accused. The judge is a disinterested and objective participant in the proceeding. 'Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge.' [Citing United States v. Marzano, 2 Cir., 1945, 149 F.2d 923, 926]"

in his comments; he cannot be an advocate; he cannot urge his own view of the guilt or innocence of the accused." Billeci v. United States, 87 U.S.App.D.C. at page 283, 184 F.2d at page 403. By the questions and instructions we have quoted, and by showing special favor to the prosecution in other ways as well,[26] the judge exceeded these limits.

The harm was not cured, as the Government suggests, by including in the charge the standard instruction that it was for the jury to find the facts and that they were not bound by his comments. "His definite and concrete assertion[s] of fact, which he had made with all the persuasiveness of judicial utterance, * * * [were] not withdrawn." Quercia v. United States, supra, 289 U.S. at page 472, 53 S.Ct. at page 700. "Such admonitions [as were given] may offset brief or minor departures from strict judicial impartiality, but cannot be considered sufficient here." United States v. Brandt, supra, 196 F.2d at page 656.

B. Erroneous Exclusion of Evidence.

 In aid of its claim that Blunt was suffering in June from the disease the doctors diagnosed in August and September, the defense offered to prove that when he was brought before the United States Commissioner on June 30, 1952, two days after his arrest, that official recommended medical treatment. The judge ruled:

"You may make your tender of proof but I will exclude that. The fact the Commissioner recommended medical treatment is not competent. The Commissioner is not an expert

on medical disease. It would be just as competent to introduce my opinion that a certain person is insane. That would not be competent."

This ruling was erroneous. The same judge correctly stated the law, in another case, in admitting lay testimony that the accused was of sound mind. He said:

"The rule in this jurisdiction is that a layman may express an opinion as to mental competency, provided he first states the facts upon which he bases his opinion. And I think the facts have been stated.

"The only difference between the competency of a layman and an expert in that field, so far as the District of Columbia is concerned, is that a hypothetical question may not be put to a layman. But a layman may express an opinion as to sanity. The Court of Appeals has held that time and time again." [27]

The judge's devaluation of the psychiatrists' testimony as based on examinations made too late makes his exclusion of the Commissioner's opinion, formed and expressed a few days after the acts charged, especially prejudicial.

 Dr. Gilbert, responding to a question about the symptoms Blunt had displayed under examination, was interrupted by the court with the following comment:

"I don't think we want to go into too much detail. If there are any particularly important symptoms you might mention them. In your examinations you probably examined him over several hours, and we

---

26. Thus, in the cross-examination of Dr. Gilbert, the judge interposed a question which might make it appear that the witness was being evasive, when actually he was not. But, when a prosecution witness was being cross-examined, the judge injected a question to remedy a seeming weakness of the testimony. The judge held defense counsel to strict procedure in framing his questions, but in sustaining a defense objection to an improper question by the prosecutor, the

judge made a remark which could be taken to mean that the objection was overly-technical and then he said: "I am going to interrupt you if I may. I think I can reframe your question so that it will be admissible." He did reframe it. The right of a trial judge to assist in developing the facts is undisputed. But assistance so given as to indicate partiality cannot be tolerated.

27. United States. v. Lyles, Criminal No. 119–54, Jan. 19, 1957, Tr. 109.

can't take the time to get all details."

The discretion of the trial judge to limit testimony for the purpose of avoiding prolixity and undue cumulation is undoubted. But, in the light of his instruction to the jury that the psychiatric opinions were not based on "actual observation or on actual facts," the judge's circumscription of the testimony was erroneous and prejudicial.

### C. Comments Regarding "Release".

 That one who commits a wrong by reason of insanity must be acquitted is so well-settled that no one questions it. When the defense of insanity has been properly invoked, the law requires proof beyond a reasonable doubt that the accused was sane at the time of the offense charged. It will not countenance an appeal to a jury for a conviction upon the ground that, even if he was insane, he is the type of person who may be dangerous. Only the guilty are to be punished. For the merely dangerous, society provides other treatment. Pleas for the conviction of the dangerous may secure the conviction of the innocent.

The judge interrogated Dr. Perretti as follows:

"Q. Then I am going to ask you one more question. Suppose the jury finds him not guilty on the ground of insanity and he is released, is he liable to do the same thing again? A. If he is released he may—the mental symptoms may recur based upon some environmental situation, or something that may happen to him if he were out in the community.

"Q. And he may do these things? A. The symptoms may recur.

"Q. I want to know whether there is any likelihood of his doing

the same thing again. A. He may, that is correct.

"Q. Then it would be dangerous to the community, in your opinion, to turn him loose, would it not? A. If the condition would recur.

"Q. And you think it may recur? A. It may recur."

In his interrogation of the other two psychiatrists, the judge also conveyed to the jury that "a complete recovery in dementia praecox cases is rare"; that the disease "is apt to recur even after a patient is discharged as sufficiently improved to be able to remain at large"; and "if it recurs the person might do some dangerous act before he is apprehended * * *."

 The Government argues that it was proper thus to inform the jury because they "should have the benefit of the psychiatrists' complete diagnosis pertaining to the accused's mental disease." Evidence of mental condition at a given time is relevant to a determination of mental condition as of another time not unreasonably far removed. It may be proper to inquire into the probability, that, as of the time of the act charged, the accused's mental condition was the same as it was found to be somewhat earlier or somewhat later. But nothing justifies a judge in warning a jury that, if they acquit the accused, they will be releasing a dangerous man to prey upon society.[28]

### D. Erroneous Instruction.

When the jury had been out for several hours, the judge brought them back to inquire into their progress. After a report by the foreman that they were "still undecided," they retired for further deliberation and in about a half hour returned stating that they "cannot agree unanimously on a verdict and * * * further deliberation will not

28. A person acquitted by reason of insanity is not "turned loose"; he is "confined in a hospital for the mentally ill." D.C.Code, § 24–301(d) (1951 ed., Supp. V). And he is not released from confinement until the hospital superintendent certifies that he "will not in the reasonable future be dangerous to himself or others." This certification, on demand of the Government, is reviewed by the District Court. Id., § 24–301(e).

result in agreement." The judge refused to accept the jurors' opinion, and ordered them back to the jury room, instructing them, in pertinent part:

> "I want you to go back to the jury room, ladies and gentlemen, and deliberate further and endeavor to arrive at a verdict, and consider the case in the light of these additional observations I have given you. Some jury will have to decide this case some time. You should be that jury because no other jury will know any more about this case than you do. I hope that you will make an endeavor to reach a unanimous verdict, and *I see no reason why you shouldn't be able to do it promptly.*

> \* \* \* \* \* \*

> "Bear in mind the remarks that I gave to you, and bearing them in mind *I see no reason why you should have any difficulty in arriving at a verdict, because the issue is a simple one, and there is only a single issue, really.*"

The jury retired at 3:30 p. m. and at 4:10 p. m. agreed unanimously that the defendant was guilty as charged.

There were two issues in the case (1) whether Blunt did the acts charged; and (2) whether, if he did, he was then sane. It is unnecessary to consider which issue the judge meant to leave with the jury. Taking either issue away from the jury was fatal error.

III. Conclusion.

Blunt has been in custody almost five years. He has served over three years of a sentence which we hold was, because of all the foregoing errors,[29] improperly imposed. The judgments of conviction must be reversed and the cases remanded "for retrial before a different judge,"[30] provided Blunt is first judicially determined to be competent to stand trial.

In Misc. 704, the judgments of conviction are reversed.

In Nos. 13294, 13295 and 13296, the appeals are dismissed as moot.

---

29. We do not consider whether there was sufficient evidence of sanity to take the case to the jury. Upon a new trial, the determination of this question will be governed by Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52.

Other error alleged by appellant need not be commented on since it is unlikely to recur upon a new trial.

30. Calvaresi v. United States, 1955, 348 U.S. 961, 75 S.Ct. 522, 99 L.Ed. 749.