Willie JONES, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15488.

United States Court of Appeals
District of Columbia Circuit.

Argued May 25, 1960.

Decided Oct. 5, 1961.

Petition for Rehearing Denied
Jan. 2, 1962.

Messrs. Albert J. Ahern, Jr., and James J. Laughlin, Washington, D. C., for appellant.

Mr. John D. Lane, Asst. U. S. Atty., at the time the brief was filed, with whom Mr. Oliver Gasch, U. S. Atty., at the time the brief was filed, and Mr. Carl W. Belcher, Asst. U. S. Atty., Washington, D. C., at the time the brief was filed, were on the brief, for appellees.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON, PRETTYMAN, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting en banc.

**PRETTYMAN, Circuit Judge.**

Appellant was indicted in two counts, tried, convicted and sentenced for first degree murder and assault with intent to kill. The basic facts are simple. He had had for several years a somewhat tempestuous attachment to a "common-law wife", by whom he had had children. At one point he had taken poison in her presence. He had been involved in proceedings before the Commission on Mental Health. There had been an estrangement, and the woman had evinced interest in one Winters. About three weeks prior to the events with which we are here concerned, Jones purchased a pistol. On the day in question his common-law wife was in D. C. General Hospital for surgical treatment for leg burns. Jones went to the hospital during visiting hours. He carried the gun in a shoe box. Winters was seated at the woman's bedside in a ward where there were eight patients. After a brief conversation with the woman, Jones took the gun from the box, shot and killed Winters, and fired three times at the woman, wounding her. He fired five times in all, then laid the gun on the bed, and surrendered to the officer who ran in at the sound of the shooting. To this officer and to other officers who came upon call, Jones declined to answer questions, said he wanted to talk to a lawyer, and asked for a cigarette.

Several points are made on this appeal.

**I**

The first point is that prejudicial error was committed when the United States Attorney was allowed to cross-examine Jones concerning his failure to speak at the time of the arrest and his desire to consult an attorney; and in permitting the prosecutor to advert to those facts in his summation to the jury. We think this point is not well taken.

Upon the trial the following facts were shown: A police officer was on duty in the corridor on the floor of the hospital where the killing took place. He described crucial events of the evening. The time was about 7:30 p. m. He heard the shots and ran to the ward. Jones was stepping over the body of Winters. The officer placed Jones under arrest, asked for his gun, and was told by Jones he had placed it on the bed. The officer started leading Jones toward his desk down the corridor: "I asked him why did he do the shooting, why did he shoot the man, he says, 'Well, I'd rather not make any more statements until I see my attorney.' " No objection was made to this testimony. The officer left Jones at the desk, went back to the ward, recovered the gun, picked up two slugs, and returned to Jones. Jones asked if it was permissible to smoke. Within ten or fifteen minutes of the shooting, two other officers arrived from headquarters. One of these officers identified himself to Jones and asked him

what had happened, "and he told me he didn't want to make any statement." The officer went to the ward, where an intern was administering to Winters, and then returned to Jones and asked him again if he wanted to tell "what happened". This time Jones said, "I will tell you what led up to it." He then related his association with Alma Jordon, his difficulties with Winters, the purchase of the gun, his preparation for the visit to the hospital. "And then he said: You know the rest."

About an hour later, *i. e.*, about 9 o'clock, Winters died. Jones had been taken to police headquarters. These same two officers went there from the hospital and about 10 p. m. told Jones Winters had died. "I asked him if he wanted to make a statement; and he said, no, he wanted to speak to a lawyer." No objection was made to this testimony by the police officers.

Alma Jordon testified concerning the circumstances of the shooting and, among other things, said: "He asked me how did I feel. * * * I told him I felt all right except my legs was hurting. * * * He says: Well, I got something to stop that." Thereupon, she testified, he took the pistol out of the shoe box and commenced firing.

Jones took the stand in his own defense. He testified at length on direct (50 pages of the transcript). After relating his affair with the woman and his troubles with Winters, he described in minute detail his call at the hospital on the fatal evening up to the firing of the first shot. He said he got the gun out of the box, the woman grabbed his arm, Winters pushed the bed against him, and "the gun went off." He said: "Everything went black. The last that I can remember, Reggie was touching me." He repeated this account of the shooting, up to the pushing of the bed. "At that time, the gun fired". He said: "That is all I know. That is all I can relate, until the officer—I was sitting out there at the desk where the officer was." The cross-examination was extensive (almost 100 pages of the transcript). In the course of it Jones was asked if he did not tell the two police officers at the hospital "you would prefer not to make a statement". Objection was made this time; it was overruled, and Jones said he did not remember what he said to them then; "I mean the only time I made the statement, I believe, about the lawyer was at number one locked up sometime later that night." He was later asked whether he made this statement at police headquarters (No. One); objection was made and overruled, and Jones said, "I don't know."

In his opening summation to the jury the prosecutor related the facts surrounding the shooting. He described Jones as "Calm, cool, deliberate, self-contained." He then referred to the call of the two officers on Jones at police headquarters and said:

"And what does this cool, calm and deliberate Defendant say at that time?

"No, no, I don't want to make a statement. I would prefer to talk with an attorney."

In his closing the prosecutor again related in detail the facts of the shooting, Jones's statement, the incidents at police headquarters. He wove all this into his reply to the argument of defense counsel that there was not a scintilla of evidence which would justify a verdict of first degree murder. He said, *inter alia:*

"Those are all acts of a thinking, rational, normal person, who knows what he is doing, who is thinking things, who has it planned out.

\* \* \* \* \* \*

"And then he has the audacity, in his cool, calm and deliberate way, of saying: Give me a cigarette. And telling the police: I won't tell you where I got the gun. I took it over here tonight. You know the rest.

\* \* \* \* \* \*

"No, I would prefer to talk to a lawyer."

We have related these facts in detail because we are deciding this case—this

case upon these facts and under these circumstances. There are many cases in the reports dealing with statements of accused persons refusing to make statements or demanding to see a lawyer. It is quite apparent there are established general rules but no established routine answer; the answers, under the rules, depend upon the surrounding circumstances and the context.

As an initial parenthesis we mention problems which we do not have here. We do not have the problem which was presented in Raffel,[1] Grunewald[2] and Stewart.[3] Nor do we have a case in which a defendant, in the presence of an accusatory statement by another person, refused to make a statement or made an evasive reply.[4] Nor do we have a case, such as Kelley v. United States,[5] in which an accused, in the presence of an accusatory statement, says merely that he wants a lawyer. Many cases concern the evidentiary consequences of silence on the part of an accused. Somebody states something; the accused says nothing; does he thereby admit the fact stated? Difficult problems of jurisprudence are presented. But we have no such case here. Nobody stated anything; Jones did not stand silent.

The determinative characteristics of the problem before us are: Jones made his first statement at the time and place of the crime—on the spot a few minutes after the shooting. He had not been subjected to interrogation or inquiry; in each instance he was asked one simple question. That he committed the homicide is unquestioned; he does not dispute it. He voluntarily took the stand at the trial and testified as to events up to and including the first shot. He testified that

he "blacked out" after that. The prosecutor used the statements as direct evidence of the state of Jones's mind at the time of the offense—"cool, calm and deliberate"—to combat the argument of defense counsel that there was not a scintilla of evidence of elements of first degree murder and to combat the defense of "blackout".

■ Jones's statements first came into the record as part of the description of the events which occurred at the time and on the scene of the crime. No objection was made to them. Nor do we see how there could have been objection. What is said and done under such circumstances is admissible under elementary rules. His second statement of his desire to see a lawyer came in response to a single simple question, addressed to him when he was informed his victim had died. This was within two hours of the shooting. He had not been subjected to any sort of interrogation or examination. He had shot a man in the presence of eight witnesses; he was being held; the man died; he was so informed, and he said he wanted a lawyer. We cannot see any ground for objection to the admission in evidence of his statement; and his counsel made none.

■ Jones voluntarily took the stand and claimed a loss of recollection of part of the chain of events at the shooting. The obvious response of the prosecutor was to put to him questions about rational acts which the prosecutor knew he had performed at the time. This was clearly proper cross-examination. It was not merely an attack on credibility but was a direct attack upon the witness's version of the crucial events surrounding the crime. It was a direct attack upon

---

1. Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926).

2. Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

3. Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961).

4. See. e. g., Egan v. United States, 137 F.2d 369 (8th Cir.), certiorari denied, 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474 (1943); Graham v. United States, 15

F.2d 740 (8th Cir., 1926), certiorari denied sub nom. O'Fallon v. United States, 274 U.S. 743, 47 S.Ct. 587, 71 L.Ed. 1321 (1927); Price v. United States, 5 F.2d 650 (6th Cir., 1925); 4 Wigmore, Evidence §§ 1071–1072 (3d ed. 1940); Annot., 115 A.L.R. 1510 (1938). The cases cited by Wigmore and in the Annotation differ in result.

5. 99 U.S.App.D.C. 13, 236 F.2d 746 (D.C. Cir., 1956).

the heart of the defense. Jones on the stand was in the position of any other witness, as many cases point out.[6] The prosecutor's course was a classic example of the proper purposes of cross-examination.

It would seem to us unrealistic to see in Jones's statement an implication of guilt. This man had shot two people in the presence of several onlookers. What more natural remark could he make than that he wanted to see a lawyer? What implication of guilt could the remark possibly convey under these circumstances? Of course, under other circumstances, where, for example, his entire involvement in the offense was an issue, his refusal to make a statement and plea to see a lawyer might convey such implications. But under the facts of this case we cannot see wherein any such incrimination of himself could be drawn from the remark.

[3, 4] Statements made by persons accused of crime and tending to indicate guilt have been the subject of many appellate court decisions and much confusion. Sometimes distinctions are drawn between confessions and admissions.[7] Confessions are admissions of the crime itself.[8] Admissions, so-called, concern only some specific fact which, in turn, tends to establish guilt or some element of the offense.[9] When freely and voluntarily made, without threat or inducement, and without taint of illegality in their procurement, they are universally admitted in evidence.[10] Indeed they are regarded as of exceptionally valuable probative quality.[11] Circumstances under which such statements are made may render them inadmissible. Sometimes the circumstances (coercion, inducements, etc.) are deemed to render the statement testimonially untrustworthy;[12] sometimes the circumstances depict compulsory incrimination; and sometimes, in the federal system, illegality in the circumstances of procurement may render the statements inadmissible.[13] Admission of guilt, whole or partial, may be excluded as violative of due process, as in White v. Texas,[14] or as violative of fair standards of judicial administration, as in McNabb v. United States.[15] But in other than these circumstances, we repeat, confessions and admissions are admissible. The criteria of inadmissibility are to be found in the circumstances which surround the making of the statements. In the case at bar there was no procedure which impinged upon any of those principles. We find no principle of law which would exclude these statements made by Jones under the circumstances shown by this record.

If the statements made by Jones had been confessions or admissions, they

6. See note 22, infra.

7. See generally 3 Wigmore, Evidence §§ 816, 821 (3d ed. 1940); 4 id. § 1050; McCormick, Evidence § 113 (1954).

8. Gulotta v. United States, 113 F.2d 683, 686 (8th Cir., 1940); Ziang Sun Wan v. United States, 53 App.D.C. 250, 255, 289 F. 908, 913 (D.C.Cir., 1923), reversed on other grounds, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (1924).

9. Ibid.

10. Bram v. United States, 168 U.S. 532, 557–558, 18 S.Ct. 183, 42 L.Ed. 568 (1897); Wilson v. United States, 162 U.S. 613, 623, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); Murray v. United States, 53 App.D.C. 119, 124, 288 F. 1008, 1013 (D.C.Cir.), certiorari denied 262 U.S. 757, 43 S.Ct. 703, 67 L.Ed. 1218 (1923). See discussions in Forte v. United States, 68 App.D.C. 111, 94 F.2d 236 (D.C.Cir., 1937), and in Ercoli v. United States, 76 U.S.App.D.C. 360, 131 F.2d 354 (D.C. Cir., 1942).

11. Milton v. United States, 71 App.D.C. 394, 398, 110 F.2d 556, 560 (D.C.Cir., 1940); 3 Wigmore, Evidence § 866 (3d ed. 1940); 4 id. § 1048.

12. 3 Wigmore, Evidence § 822 (3d ed. 1940); Wood v. United States, 75 U.S. App.D.C. 274, 277, 128 F.2d 265, 268, 141 A.L.R. 1318 (D.C.Cir., 1942).

13. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

14. 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342 (1940).

15. 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed 819 (1943).

would have been admissible. No shadow of reason for inadmissibility appears. They were clearly voluntary—simple responses to natural questions posed at the time and place of the crime and shortly thereafter when the victim died and Jones was so informed. If, by a course of reasoning with which we do not agree, the statements be viewed as admissions by Jones of deliberation and premeditation (elements of first degree murder), they are nevertheless clearly admissible. None of the grounds of inadmissibility exists in respect to them. Not even the most remote compulsion attached to their utterance; there was no threat or inducement; there was no delay, necessary or unnecessary; no protracted questioning. At most the admission thus discerned in these statements would be an inference from what was said. A vague suggestion of a fact, derived by inference, could hardly be less admissible than a full clear averment of the fact. We do not see how a statement from which an admission of deliberation might be inferred could be held inadmissible as evidence under circumstances in which a flat admission of full guilt would be admissible.

But, however all that may be, we think Jones's statements were not confessions or admissions. They were merely incidents which occurred at or about the scene and time of the crime. It is significant that the prosecutor treated Jones's statement that he wanted a cigarette exactly as he treated the statement he wanted a lawyer. Jones's request for a cigarette was not a confession or admission. It was something Jones said immediately after he had shot two people and one had died. It was probative not of some third fact but of Jones's state of mind, of which it was direct evidence.[16] Such evidence does not come within the circumscriptions of confessions or admissions.

The same observations apply to the statement about wanting a lawyer. As we have said, we are unable to agree with the contention that such a request, made in the circumstances here present, supports an inference of guilt. At any rate no effort to use it as such an inference was made. The prosecutor used it, just as he would have used anything Jones had said at that time and place, to show that Jones was calm, cool and deliberate. The pertinent point was that the statements were clearly rational. Whatever they concerned—a cigarette, a lawyer, or whatever—so long as they were rational, they served the prosecutor's purpose, and he used them for that purpose only.

We said in Kelley v. United States:[17]

"However, admissions or confessions are admissible against the party who made them despite the rule against hearsay evidence, * *."[18]

The court is here in agreement that Jones's statements were not confessions or admissions. So the question upon which we divide is: Are these statements, not admissions or confessions, admissible? What this man said was direct evidence of the state of his mind. It was relevant, competent, and of probative weight on that point.[19] No attempt was made to use those statements to prove any fact recited in them; indeed, no fact was recited in them and no contained fact could be inferred from them.

Our dissenting brethren seek to find some specific rule of law affirmatively asserting the admissibility of statements such as Jones's. Finding none, they conclude inadmissibility. But it seems to us this approach is erroneous and leads to confusion. Basically, these statements, being relevant, material and competent, are admissible. The problem is whether any specific rule excludes them, whether there is some idiosyncrasy which denies to them the general basic rule of admis-

16. See, e. g., Blunt v. United States, 100 U.S.App.D.C. 266, 278, 244 F.2d 355, 367 (D.C.Cir., 1957); Boynton v. Burrows, 83 U.S.App.D.C. 227, 228, 167 F. 2d 759, 760 (D.C.Cir., 1948); Hart v. United States, 76 U.S.App.D.C. 193, 194, 130 F.2d 456, 457 (D.C.Cir., 1942).

17. Supra note 5, at 15, 236 F.2d at 748.

18. See 4 Wigmore, Evidence §§ 1048–1050 (3d ed. 1940), cited by us in Kelley; also see McCormick, Evidence § 239 (1954).

19. See note 16, supra.

sibility otherwise applicable. We find none; the general rule applies. It may be that this difference in approach is the crucial difference between us.

Our dissenting brethren refer to the problem of multiple admissibility ("atomizing" the testimony). We think no such problem is in this case, since no partial inadmissibility appears, but if the problem were here the testimony would be admissible. As Judge Morris Soper wrote for the Fourth Circuit,[20] relying upon Wigmore and cases there cited, the general rule is that evidence fully admissible for one purpose and inadmissible for other purposes is admissible. "This doctrine," says Mr. Wigmore, "though involving certain risks, is indispensable as a practical rule." [21]

■ In the next place, under well-established rules Jones waived his constitutional rights. He waived them when he voluntarily took the stand and testified as to the facts of the shooting up to a specific point. When he denied recollection or knowledge of immediately subsequent events, he opened to legitimate inquiry those events. The rule is that when an accused voluntarily takes the stand he waives his constitutional rights as to all matters concerning which cross-examination is otherwise normally proper.[22] There is a gray area in the law relating to inquiry as to collateral matters going to credibility only. But the questions put to Jones are not in that area. The subject matter of the questions was directly related to the offense on trial. This cross-examination was normally proper. So, even if the statements had not already been in the record, they were proper subjects of inquiry upon cross-examination.

■ The use made by the prosecutor in his address to the jury of Jones's statements was well within the limits of propriety. Jones's defense was that he was not mentally conscious when he fired four of the five shots. This was an obvious attempt to nullify intent. The prosecutor attacked that defense, factually and argumentatively. The argument was a vigorous attack upon the version of events given by the defendant as a witness in the box. The prosecutor was under no obligation, as we see it, to refrain from testing Jones's account by inquiring of him concerning actual occurrences at the time, or to refrain from urging upon the jury the pertinence of these facts.

■ We are unable to perceive the substance of the contention based upon the Sixth Amendment. We do not see how an accused's expression of desire to have a lawyer impinges upon his right to have one.

### II

■ It is argued to us that the evidence respecting the mental condition of the accused required a directed verdict of not guilty by reason of insanity. Without relating the testimony we deem it sufficient to say we are of opinion that a question for the jury was presented.

### III

It is argued to us that the trial court erred in permitting a Dr. McIndoo to testify to statements made to her by Jones in the course of a professional ex-

20. Sprinkle v. Davis, 111 F.2d 925, 931, 128 A.L.R. 1101 (1940).

21. 1 Wigmore, Evidence § 13 (3d ed. 1940). See also McCormick, Evidence § 59 (1954).

22. Brown v. United States, 356 U.S. 148, 154–155, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); Johnson v. United States, 318 U.S. 189, 195, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (in which the claim of privilege was granted by the trial court and the Supreme Court condemned later comment upon the claim; this point is not in the case at bar); Caminetti v. United States, 242 U.S. 470, 492–495, 37 S.Ct. 192, 61 L.Ed. 442 (1917); Fitzpatrick v. United States, 178 U.S. 304, 20 S.Ct. 944, 44 L.Ed. 1078 (1900); Peckham v. United States, 93 U.S.App.D.C. 136, 141–142, 210 F.2d 693, 699 (D.C.Cir., 1953); United States v. Gates, 176 F.2d 78, 79 (2d Cir., 1949); Banning v. United States, 130 F.2d 330, 337 (6th Cir., 1942), certiorari denied, 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556 (1943); 8 Wigmore, Evidence § 2276(2) (3d ed. 1940).

amination on August 8, 1958, which was three days after the shooting. Dr. Mc-Indoo was first called by the defense. She testified as an expert psychiatrist and related features of her examination of Jones in January, 1958, eight months before the shooting affray. Then counsel for Jones asked the following questions and received the following answers:

"Q. As I understand, your contact only was as to January or early February, as a result of this attempted suicide by taking the poison? A. No, sir, I saw him two days after, in jail.

"Q. Well, what I want to know, did you see him in the month of August? A. I did.

"Q. All right. What was the date in August? A. On the 8th of August.

\* \* \* \* \* \*

"Q. And it was your view that you should have more opportunity to observe him; is that it? A. I felt in fairness to him, he should be given a complete work-up."

Jones's counsel offered in evidence, and examined Dr. McIndoo upon, a written report she had made on her examination of August 8th. The point thus sought to be made by the defense was, obviously, that a staff psychiatrist of D. C. General Hospital thought three days after this crime, upon examination, that Jones needed "a complete work-up". The prosecutor asked a few formal questions respecting the August 8th examination. Later in the trial the Government presented Dr. McIndoo as its witness and examined her at length concerning her examination of Jones on August 8th and sought her expert opinion as to his mental condition on August 5th, the day of the alleged murder. In the course of this testimony the Doctor related Jones's life history and other basic factual data Jones had given during that interview. No statements made by Jones respecting the crime in question were offered through Dr. McIndoo.

Appellant argues that Dr. McIndoo's examination was unauthorized, that Jones had not been apprised of his constitutional rights, and that "It would appear monstrous that a doctor appearing at the jail and interviewing an untutored accused could, through the process of an interview, elicit information not only as to the crime but as to the accused's mental state and then to testify against the accused at the trial." The Government replies that the matter was injected into the trial by the defense.

 We think the Government's reply to the argument is a sufficient one. The defense sought an expert opinion of Dr. McIndoo and specifically premised their inquiry in part upon the August 8th interview. An expert thus testifying is always subject to cross-examination or inquiry upon rebuttal as to the data upon which he premised his opinion.[23]

### IV

 Appellant argues that his indictment was defective in that it did not contain the phrase "being of sound memory and discretion", which is in the statutory definition of first degree murder.[24] Counsel candidly concede the point was decided adversely to them by this court in Hill v. United States.[25] They request reexamination of that case and the later cases in which it has been cited. We have reexamined the matter and are not persuaded to change the ruling. The statutory definition is the common-law definition as given by Blackstone[26] and by Coke.[27] In this jurisdiction it was held by Judge Cox in Guiteau's Case[28]

23. We note that counsel's reference, in the argument we have quoted from his brief, to facts concerning the crime is an inadvertence.

24. D.C.Code § 22–2401 (1951).

25. 22 App.D.C. 395 (1903).

26. 4 Comm. 195.

27. 3 Inst. 47.

28. 10 F. 161, 163 (1882).

that the quoted phrase means merely "a responsibly sane mind". The Hill case, supra, was followed in others.[29] An allegation of sanity is not required in an indictment.

Two judgments of conviction were entered by the District Court, one upon Count I of the indictment, for first degree murder, and the other upon Count II of the indictment, for assault with intent to kill. Both judgments are

Affirmed.

FAHY, Circuit Judge, with whom EDGERTON, BAZELON and WASHINGTON, Circuit Judges, join, concurring in part and dissenting in part.

When the United States obtains a conviction of first degree murder in the District of Columbia the sentence is death.[1] This requires care on the part of the United States not to use incompetent or even questionable evidence to influence the jury to decide that the homicide was first degree rather than second degree murder; for life imprisonment is the maximum sentence imposed for the latter offense.

First degree murder is a purposeful killing with deliberate and premeditated malice,[2] whereas second degree is with malice aforethought but without deliberation or premeditation. The premeditation and deliberation essential to first degree may be of quite brief duration. The court so instructed in the present case, and added,

"[I]t is the fact of deliberation rather than the length of time it

continued that is important, although some appreciable period of time must have elapsed during which the Defendant deliberated in order for this element to be established. But no particular length of time is necessary for deliberation; and it does not require the lapse of days or hours or even minutes.[3]

The dividing line between the death penalty and a lesser punishment accordingly may be very thin, from which it follows that the use of incompetent evidence, or the misuse of competent evidence, on the issue of deliberation must be avoided. The importance of this is graphically illustrated by the present case. There was no question defendant committed the homicide. Nevertheless the jury, after retiring to consider their verdict, sent a note to the judge as follows:

"The jury wants to hear again the definitions for murder in the first degree, second degree murder and manslaughter." [4]

The court complied. The jury resumed their deliberations and later retired for the night. After again resuming their deliberations the following morning they sent a second note to the judge, as follows:

"The jury is unable to reach unanimous agreement as to degree. Is there any further help we can obtain from the bench?" [5]

The so-called Allen instruction, regarding efforts to reach agreement, was then given. Some while later the first degree verdict was rendered.

---

29. Bishop v. United States, 71 App.D.C. 132, 107 F.2d 297 (1939); Hamilton v. United States, 26 App.D.C. 382 (1905); Burge v. United States, 26 App.D.C. 524 (1906).

1. 22 D.C.Code § 2404 (1951).

2. 22·D.C.Code § 2401 (1951).
 We are not concerned in this case with that kind of first degree murder that arises from the killing of another in the commission of a felony. And for purposes of simplicity I do not refer either to manslaughter or excusable homicide.

The position I take is sufficiently explained by emphasizing the difference between first degree, other than homicide in the commission of a felony, and second degree murder. 22 D.C.Code § 2403 (1951).

3. Transcript, page 1210. In this opinion I include transcript references, thus intentionally departing from the usual practice.

4. Id. at 1229.

5. Id. at 1241.

It may well be that it was incumbent upon the trial judge, especially when this second note reached him, to instruct the jury as to the law in such a situation, namely,

"[I]t is proper for the court to define both crimes, leaving it to the jury to say which, if either, had been committed; and to add that, if they entertained a reasonable doubt as to the degree, they should find the defendant guilty of the lesser crime."

Goodall v. United States, 86 U.S.App. D.C. 148, 151, 180 F.2d 397, 400, 17 A.L.R.2d 1070. But this opinion will be devoted primarily to the ground for reversal now to be discussed. The closeness of the issue as to the degree of homicide is apparent. On this background we proceed, first setting forth in some detail the testimony bearing upon our position.

An officer of the Metropolitan Police Department testified that on the day of the homicide he was assigned to the lock-up ward at the District of Columbia General Hospital, and that after the shooting he took defendant into custody. Questioned regarding any conversation which might have occurred, the officer testified:

"A. *. * * After I led him, I started leading him toward the south, to my desk; I asked him why did he do the shooting, why did he shoot the man, he says, 'Well, I'd rather not make any more statements until I see my attorney.'" [6]

Another officer of the Metropolitan Police Department testified that with still another officer accompanying him he saw defendant at the Hospital after the homicide there, and defendant told him he did not want to make any statement. (Tr. 205) The officers then made inquiries among others at the Hospital and returned to defendant, who gave them certain information not material to our present problem. Somewhat later after he had been placed in the cellblock at Police Headquarters defendant was advised by the officers of Winters' death. One of the officers testified:

"Q. After you told him that [that Winters had died], what if anything did the Defendant tell you? A. I asked him if he wanted to make a statement; and he said, no, he wanted to speak to a lawyer." [7]

The defendant testified in his own defense. On cross examination it was recalled to him that both at the Hospital and later at Police Headquarters the officers asked him if he wanted to tell them about the homicide and he said he would prefer not to make a statement. (Tr. 769, 770) The court overruled objection to these questions. The cross examination continued:

"Q. It's a fact that you told Sergeant Couture and Sergeant Weber that you preferred not to make a statement, that you would rather talk to your lawyer? A. I don't know exactly what I told them; I know I talked to them. I mean the only time I made the statement, I believe, about the lawyer was at number one locked up sometime later that night." [8]

We turn now to the use made by the prosecution of this testimony. In his summation to the jury the prosecutor four times pressed for first degree murder on the basis of defendant's statements he wished to make no statement and to consult a lawyer. The following excerpts are from the transcript of the prosecutor's argument to the jury:

"What next does the evidence show as to the coolness and calmness and deliberation of this Defendant, who was not out of his mind at the time that shooting went on—but we will get to that later.

"Up come the officers from the Homicide Squad, Couture and Weber; and there sits Jones.

---

6. Id. at 175.

7. Id. at 217.

8. Id. at 769.

"The officers come to him the first time and say: Do you want to tell us what happened?

"And what does the Defendant say: No, no, I would rather talk to an attorney." [9]

The argument was then directed to the incidents at Police Headquarters:

"And then an hour later, or thereabouts, over in the cellblock, the Central Cellblock in the Police Headquarters, Couture and Weber go back to this Defendant. They have learned in the meantime that Winters has departed this life; and they go to this Defendant Jones and they say:

"Jones, Winters is dead. Do you want to tell us about it?

"And what does this cool, calm and deliberate Defendant say at that time?

"No, no, I don't want to make a statement. I would prefer to talk with an attorney." [10]

Again the prosecutor argued to the jury:

"And then he has the audacity, in his cool, calm and deliberate way, of saying: Give me a cigarette. And telling the police: I won't tell you where I got the gun. I took it over here tonight. You know the rest.

"Do you want to tell us any more?

"No, I would prefer to talk to a lawyer." [11] .

Again, the prosecution stated to the jury:

"Argument is made that a doctor said from the stand—I believe it was Dr. Williams or Dr. Miller—that it was consistent with insanity to have this Defendant tell the police that he wanted to talk with a lawyer.

"Well, now, I will put this to you, ladies and gentlemen, if I may, please. It is much more consistent, is it not, after a man has shot someone, and when the police say something to him, and he says, I want to talk to a lawyer, it is because he knows he shot the man and he doesn't want to say anything about it.

"It is much more consistent that that is the reason that motivated this cool and calm Defendant on the evening hours of August 5." [12]

The prosecutor ascribed to the defense a desire to seek "a compromise of manslaughter."

We now discuss the erroneous and prejudicial character, as it seems to us, of this use made of the testimony. Preliminarily we note that defendant's statements he wished to remain silent and to consult a lawyer were not admissible as admissions. Kelley v. United States, 99 U.S.App.D.C. 13, 236 F.2d 746, and particularly United States v. Kelly, D.C.D.C. 1951, 119 F.Supp. 217, 222,[13] where the late Chief Judge Laws of our District Court said:

"During an examination by the police while under arrest a defendant, usually conscious and often cautioned that anything he says may be used against him, well may be restrained from participating in a discussion of the case with police officers by a belief his interests will better be served at the time by exercising his right to remain silent. It is not reasonable to interpret an assertion of right as constituting an admission of guilt. Kelly's refusal to comment on Washington's confession may therefore not be construed as an admission of guilt, and is not admissible in evidence against him."

9. Id. at 1102.

10. Id. at 1102–03.

11. Id. at 1190–91.

12. Id. at 1193.

13. In Kelly, Chief Judge Laws of the District Court had considered Peckham v. United States, 93 U.S.App.D.C. 136, 210 F.2d 693, as not to the contrary. See also Allen v. United States, 106 U.S.App.D.C. 350, 352–53, 273 F.2d 85, 87–88 (dissenting opinion).

Not being admissions, the testimony was inadmissible on the issue of guilt, including the issue of the degree of guilt. The great weight of authority, as stated in State v. Dowling, 1941, 348 Mo. 589, 599, 154 S.W.2d 749, 755, as well as the Kelley and Kelly decisions previously cited, is to the effect:

> "[I]t cannot be proven that the defendant said he declined to answer on the advice of counsel; or refused to give a statement; or declared he had nothing to say; or had been warned his statements would be used against him. There are still more ruling his silence cannot be used against him when he was in doubt about his rights, as would be true of one who desired to withhold any statement until he had had legal advice."

The prosecution's original theory of admissibility seems to have been that the testimony bore on the defense of insanity. Thus, the prosecution in examining the doctors who testified as to Jones' mental condition asked them to assume the fact that when told of the death and asked to make a statement Jones said he wished to consult a lawyer. The question was then put whether in the doctor's opinion this bore upon defendant's sanity, his ability to know right from wrong. But when the officers actually testified to defendant's statements their testimony was not then, nor at any other time, limited in any manner to its possible bearing upon defendant's sanity. On the contrary, as we have seen, it was explicitly used to convince the jury that defendant was a cool, calm and deliberate man—a man guilty of first degree murder, not of a lesser degree or "compromise" of manslaughter. Admissibility of the testimony must be tested by the use to which it was put by the prosecution. Its admissibility cannot be sustained by atomizing it and finding some of its particles, as it were, possibly material on the issue of sanity or "black-out" while all the rest of it was inadmissible for the use to which it was put.[14]

As to its actual use we have seen that four times the testimony was explicitly drawn upon to sustain the charge of deliberation. It was not admissible on that issue unless competent, even were it relevant or material. We think it was not competent. If the expressions of a desire not to make a statement and to consult a lawyer, by one who has only a short time before committed a homicide and is under arrest and is being questioned by officers, can be used as evidence of the greater degree of guilt, the accused is fatally penalized for seeking a right the Constitution permits him to have.[15] Such statements by an accused, in those circumstances,[16] may not be turned into evidence of the deliberation and premedi-

14. In commenting upon this statement the majority opinion refers to the general rule under which evidence admissible for one purpose and inadmissible for another is admissible. This rule is subject to the qualifications that (1) the defendant is entitled to an instruction that the jury should consider the evidence only for its legitimate purpose, and (2) where the legitimate use of such evidence is overbalanced by the danger of its misuse by the jury for an incompetent purpose, or where the issue for which it is offered may be proved by other less prejudicial evidence, it should be excluded. McCormick, Evidence § 59 (1954). And see Shepard v. United States, 290 U.S. 96, 103, 54 S.Ct. 22, 78 L.Ed. 196; Adkins v. Brett, 184 Cal. 252, 258–59, 193 P. 251, 253–54 (1920); 1 Wigmore, Evidence § 13 (3d ed. 1940).

15. My limitation of the discussion to the context of the present homicide case does not imply that in some circumstances, not before us, such a statement might be admissible.

16. The questioning took place at the Hospital and shortly thereafter at Police Headquarters.

It is not necessary to reach the question, several times considered by the Supreme Court, whether there was denial of the constitutional right to counsel, recently discussed in the concurring opinion of Mr. Justice Douglas, in which Mr. Justice Black joined, in Culombe v. Connecticut, 367 U.S. 568, 637, 81 S.Ct. 1860, 1889, 6 L.Ed.2d 1037, where the principle is referred to in these terms:

"[A]ny accused—whether rich or poor —has the right to consult a lawyer be-

tation essential to first degree murder. To permit this is to permit an accused to receive the death penalty because he states a desire to remain silent and to consult with counsel. Yet the right to counsel, not to mention the right to remain silent, is held in the highest regard in the administration of the law applicable to one accused of crime, as the defendant was accused when he made the statements.

Clearly one who is guaranteed the right to counsel is guaranteed the right, when he has committed a homicide, is in custody and under questioning, to make known a desire to realize this right without having his expression of such a desire used to his prejudice. Otherwise the desire must go unexpressed and most likely, therefore, unfulfilled, because to express it places one in danger of conviction of first degree murder rather than of second degree.

Constitutional rights carry with them subsidiary supports to make them come alive, as recently illustrated with respect to the Fourth Amendment in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081. Law of less stature than a constitutional guaranty may also carry a like subsidiary support in the federal courts, long illustrated by McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. For constitutional and statutory rights are often of no avail unless the use of evidence is judicially tested by the adverse effect the use has upon the right.

It hardly seems necessary to add that the testimony, in addition to being incompetent and its use prejudicially erroneous, was not admissible as relevant and material, for even if in some manner it possessed these qualities, its use went far beyond any possible reach of mate-riality or relevance. Moreover, to uphold the use made of the testimony because of some possible materiality or relevance would be inconsistent with the principle underlying McNabb and Mapp.

The jury would consider the testimony according to the use to which it was put by the prosecution, not as having some theoretical relevance to the claim of a "black-out." See Shepard v. United States, 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196. Moreover, the "black-out" testimony related to the time of the homicide, not to the time of the police interrogation when defendant said he did not wish to talk but to consult a lawyer. For this reason these statements of defendant have only a remote connection at best with the "black-out" issue. It is true also that the statements were not made simultaneously with the homicide and, therefore, do not relate directly to the question whether or not at the time of the homicide defendant was "calm, cool and deliberate." Nonetheless they were forceably used by the prosecution to convince the jury of defendant's composure and deliberation at the time of the homicide. And the grave difficulty the jury experienced in reaching agreement on the degree of homicide indicates the effectiveness of this use of the statements.

Our brethren of the majority point out that Jones' statements carried no implication of guilt. As we have said, the statements were not admissions and for this reason were not admissible at all unless some other basis therefor is found. The fact that they were voluntary, as we may assume, supplies no such basis; for while compulsion excludes testimony its absence does not open the door to testimony which is inadmissible, or justify its misuse.

Our brethren of the majority say Jones made his first statement at the time and

fore talking with the police; and if he makes the request for a lawyer and it is refused, he is denied 'the Assistance of Counsel for his defense' guaranteed by the Sixth and Fourteenth Amendments."
And see Crooker v. State of California, 357 U.S. 433, 443, 78 S.Ct. 1287, 2 L.Ed. 2d 1448 (dissenting opinion).

Our case is the simpler one of the use of testimony the accused desired counsel, and to remain silent in the interim, as evidence of deliberation and premeditation in a trial for first degree murder.

place of the crime—on the spot a few minutes after the shooting—that his statements first came into the record as part of the description of the events which occurred at the time and on the scene of the crime, and that the second statement was made within two hours after the shooting. It is not suggested by the majority or claimed by the United States that the statements were admissible as part of the *res gestae*. They were made after arrest in answer to police interrogation, the first one near the scene but not at the time of the homicide, the second one at police headquarters some time later and at neither the scene nor near the time of the homicide. We cannot agree that these statements, more clearly the later one, were part of the description of what occurred, taking this to mean what occurred as to the commission of the crime. Quite the contrary. They were statements of defendant that he did not want to give a statement to the officers investigating the shooting that had occurred, that he wanted to consult counsel.

It is said Jones waived his constitutional rights. We think not; by taking the stand he waived only in some respects the one constitutional right known as the Fifth Amendment privilege, as to which we pose no problem.

Our brethren of the majority see in the accused's expression of desire to have a lawyer no impingement upon his right to have one. We agree; but we see in the use made by the prosecution of the expressions of such a desire both an impingement upon the right to have counsel and an improper use of the expressions on the issue of premeditation and deliberation.

. The prosecution was well within its rights in arguing to the jury that defendant was cool, calm and deliberate when he killed the deceased, and was guilty of first degree murder. There was competent, relevant and material evidence upon which to base such an argument, both affirmatively and in answer to the defense claim of the absence of deliberation and premeditation. But in making this argument the prosecution, we think, could not resort, as it did, to defendant's expressions of a desire to remain silent and to consult counsel. We say this, to summarize with some repetition, on several grounds: The statement to that effect at police headquarters in response to interrogation was not evidence of deliberation or premeditation at the time of the homicide which occurred two hours earlier. Even if it could be said to bear to some degree upon that issue it was incompetent because of the impingement such use of it has upon the right to counsel and to remain silent under questioning. The statement made shortly after the shooting, assuming it was relevant and material on the issue of deliberation and premeditation, was nevertheless incompetent for the same reason applicable to the later statement. And if the first statement was competent as well as relevant and material, the prosecution did not confine itself to the use of that statement, but bore down on the later statement as well, which was not only incompetent but was neither relevant nor material on the issue of deliberation or premeditation at the time of the homicide. Yet it was used on that issue in a manner and under circumstances which we must assume from the verdict were effective in causing an uncertain jury to resolve its doubt in favor of first degree murder.

We are not led to conclude the judgment should be affirmed by knowledge that defendant took the life of another and by saying he should therefore forfeit his own. For the taking of life by the United States under the law is governed by different considerations than those which bring an individual to take the life of another. The difference is made manifest by the circumstances of this case. The situation was fraught with emotional stress growing out of the relationship of the parties. When the United States seeks the death penalty it is under no such stress. It accumulates and sorts the evidence, appraising it within the applicable rules, rejecting the inadmissible and putting forward the admissible.

The prosecution in seeking the result it desires is confined to the factual relationship of the competent, relevant and material evidence to the charge on trial. There is the duty to present the case strongly, faithful to the public trust. But there is no personal crisis to explain or to justify departure from the use of competent evidence and appropriate means. The jury is entitled to confidence that they will render the right verdict without having pressed upon them testimony and means which undermine the validity of the verdict. And we on our part are not judges at large, but only within the latitude we can find the law allows. In a capital case this latitude as to what is permissible should be sought with a conservatism which has regard for the consequence to which a mistake may contribute.

While we have referred to the objection made by defense counsel to the cross examination we have not discussed the adequacy of the objection; for in any event it is well settled that in a capital case the court independently reviews the record and will correct prejudicial error even though not pointed out in the trial court. Weakley v. United States, 91 U.S. App.D.C. 8, 12, 198 F.2d 940, 944, and cases cited. And see Fisher v. United States, 328 U.S. 463, 467–68, 66 S.Ct. 1318, 90 L.Ed. 1382. It is well to add, in view of the majority's emphasis upon the absence of objection except during the cross-examination of defendant, that when the officers testified to defendant's statements defense counsel could not be expected to know how those statements were to be used at the end of the trial when the case was being argued to the jury. Counsel's objection during the cross-examination had been denied. The lack of other objection should not be given significant weight in determining in this capital case the merits of the questions on appeal.

We would reverse the conviction of first degree murder and remand for a new trial. We concur in affirming the conviction of assault with intent to kill.